# FEDERAL TRADE COMMISSION *v.* SPERRY & HUTCHINSON CO.

No. 70–70. Argued November 15, 1971—Decided March 1, 1972

234

WHITE, J., delivered the opinion of the Court, in which all Members joined except POWELL and REHNQUIST, JJ., who took no part in the consideration or decision of the case.

*Assistant Attorney General McLaren* argued the cause for petitioner. With him on the briefs were *Solicitor General Griswold, Harold D. Rhynedance, Jr., Karl H. Buschmann,* and *Richard H. Stern.*

*Harold L. Russell* argued the cause for respondent. With him on the brief were *Samuel K. Abrams, Claus Motulsky, J. Sam Winters, Alan R. Wentzel,* and *Wayne T. Elliott.*

MR. JUSTICE WHITE delivered the opinion of the Court.

In June 1968 the Federal Trade Commission held that the largest and oldest company in the trading stamp industry,[1] Sperry & Hutchinson (S&H), was violating § 5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. § 45 (a)(1), in three respects. The Commission found that S&H improperly regulated the maximum rate at which trading stamps were dispensed by its retail licensees; that it combined with others to regulate the rate of stamp dispensation throughout the industry; and that it attempted (almost invariably successfully) to suppress the operation of trading stamp exchanges and other "free and open" redemption of stamps. The Commission entered cease-and-desist orders accordingly.

---

[1] On the nature of the industry, see generally Comment, Trading Stamps, 37 N. Y. U. L. Rev. 1090 (1962). The Commission proceedings in the instant case are discussed in Comment, The Attack on Trading Stamps—An Expanded Use of Section 5 of the Federal Trade Commission Act, 57 Geo. L. J. 1082 (1969).

S&H appealed only the third of these orders. Before the Court of Appeals for the Fifth Circuit it conceded that it acted as the Commission found, but argued that its conduct is beyond the reach of § 5 of the Act. That section provides, in pertinent part, that:

"The Commission is empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." 15 U. S. C. § 45 (a)(6).

As S&H sees it, § 5 empowers the Commission to restrain only such practices as are either in violation of the antitrust laws, deceptive, or repugnant to public morals. In S&H's view, its practice of successfully prosecuting stamp exchanges in state and federal courts cannot be restrained under any of these theories.

The Court of Appeals for the Fifth Circuit agreed and reversed the Commission, Judge Wisdom dissenting. 432 F. 2d 146 (1970). In the lower court's view:

"To be the type of practice that the Commission has the power to declare 'unfair' the act complained of must fall within one of the following types of violations: (1) a per se violation of antitrust policy; (2) a violation of the letter of either the Sherman, Clayton, or Robinson-Patman Acts; or (3) a violation of the spirit of these Acts as recognized by the Supreme Court of the United States." *Id.*, at 150 (footnote omitted).

Holding that the FTC had not demonstrated that S&H's conduct violated either the letter or the spirit of the antitrust laws, the Court of Appeals vacated the Commission's order.

The FTC petitioned for review in this Court. We granted certiorari to determine the questions presented in the petition. 401 U. S. 992 (1971).

# I

## The Challenged Conduct

S&H has been issuing trading stamps—small pieces of gummed paper about the size of postage stamps—since 1896. In 1964, the year from which data in this litigation are derived, the company had about 40% of the business in an industry that annually issued 400 billion stamps to more than 200,000 retail establishments for distribution in connection with retail sales of some 40 billion dollars. In 1964, more than 60% of all American consumers saved S&H Green Stamps.

In the normal course, the trading stamp business operates as follows. S&H sells its stamps to retailers, primarily to supermarkets and gas stations, at a cost of about $2.65 per 1200 stamps; retailers give the stamps to consumers (typically at a rate of one for each 10¢ worth of purchases) as a bonus for their patronage; consumers paste the stamps in books of 1,200 and exchange the books for "gifts" at any of 850 S&H Redemption Centers maintained around the country. Each book typically buys between $2.86 and $3.31 worth of merchandise depending on the location of the redemption center and type of goods purchased. Since its development of this cycle 75 years ago, S&H has sold over one trillion stamps and redeemed approximately 86% of them.

A cluster of factors relevant to this litigation tends to disrupt this cycle and, in S&H's view, to threaten its business. An incomplete book has no redemption value. Even a complete book is of limited value because most "gifts" may be obtained only on submission of more than one book. For these reasons a collector of another type of stamps who has acquired a small number of green stamps may benefit by exchanging

with a green stamp collector who has opposite holdings and preferences. Similarly, because of the seasonal usefulness or immediate utility [2] of an object sought, a collector may want to buy stamps outright and thus put himself in a position to secure redemption merchandise immediately though it is "priced" beyond his current stamp holdings. Or a collector may seek to sell his stamps in order to use the resulting cash to make more basic purchases (food, shoes, etc.) than redemption centers normally provide.

Periodically over the past 70 years professional exchanges have arisen to service this demand. Motivated by the prospect of profit realizable as a result of serving as middlemen in swaps, the exchanges will sell books of S&H stamps previously acquired from consumers, or, for a fee, will give a consumer another company's stamps for S&H's or vice versa. Further, some regular merchants have offered discounts on their own goods in return for S&H stamps. Retailers do this as a means of competing with merchants in the area who issue stamps. By offering a price break in return for stamps, the redeeming merchant replaces the incentive to return to the issuing merchant (to secure more stamps so as to be able to obtain a gift at a redemption center) with the attraction of securing immediate benefit from the stamps by exchanging them for a discount at his store. [3]

S&H fears these activities because they are believed to reduce consumer proclivity to return to green-stamp-issuing stores and thus lower a store's incentive to buy and distribute stamps. The company attempts to pre-empt "trafficking" in its stamps by contractual pro-

---

[2] Often merchandise obtained by redemption is used as a gift.

[3] The efforts of some retailers to reissue S&H stamps are not involved in this case. The FTC explicitly left S&H free to seek injunctions against reissuance. 1 App. 169.

visions reflected in a notice on the inside cover of every S&H stamp book. The notice reads:

> "Neither the stamps nor the books are sold to merchants, collectors or any other persons, at all times the title thereto being expressly reserved in the Company . . . . The stamps are issued to you as evidence of cash payment to the merchants issuing the same. The only right which you acquire in said stamps is to paste them in books like this and present them to us for redemption. You must not dispose of them or make any further use of them without our consent in writing. We will in every case where application is made to us give you permission to turn over your stamps to any other bona-fide collector of S&H Green . . . Stamps; but if the stamps or the books are transferred without our consent, we reserve the right to restrain their use by, or take them from other parties. It is to your interest that you fill the book, and personally derive the benefits and advantages of redeeming it." (Reproduced at 2 App. 230.)

S&H makes no effort to enforce this condition when consumers casually exchange stamps with each other, though reportedly some 20% of all the company's stamps change hands in this manner. But S&H vigorously moves against unauthorized commercial exchanges and redeemers. Between 1957 and 1965, by its own account the company filed for 43 injunctions against merchants who redeemed or exchanged its stamps without authorization, and it sent letters threatening legal action to 140 stamp exchanges and 175 businesses that redeemed S&H stamps. In almost all instances the threat or the reality of suit forced the businessmen to abandon their unauthorized practices.

## II
## The Reach of Section 5

The Commission presented two questions in its petition for certiorari, the first being "[w]hether Section 5 of the Federal Trade Commission Act, which directs the Commission to prevent 'unfair methods of competition . . . and unfair or deceptive acts or practices,' is limited to conduct which violates the letter or spirit of the antitrust laws." The other issue relates to the significance of state court holdings that the practices challenged here are lawful.[4] Neither question requests review of the Court of Appeals' decision that the business conduct proscribed by the Commission violates neither the letter nor spirit of the antitrust laws. Accordingly, we intimate no opinion on that issue and turn to the question of the reach of § 5.

In reality, the question is a double one: First, does § 5 empower the Commission to define and proscribe an unfair competitive practice, even though the practice does not infringe either the letter or the spirit of the antitrust laws? Second, does § 5 empower the Commission to proscribe practices as unfair or deceptive in their effect upon consumers regardless of their nature or quality as competitive practices or their effect on competition? We think the statute, its legislative history, and prior cases compel an affirmative answer to both questions.

When Congress created the Federal Trade Commission in 1914 and charted its power and responsibility

---

[4] Though the Court of Appeals referred to state and federal court decisions that approved S&H's practice, our reading of its opinion leaves no doubt that it did not reverse the FTC order on the erroneous theory that such determinations might foreclose a contrary FTC § 5 decision. We therefore put aside the Goverment's second question as irrelevant and focus on its first contention.

under § 5, it explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase "unfair methods of competition" by tying the concept of unfairness to a common-law or statutory standard or by enumerating the particular practices to which it was intended to apply. Senate Report No. 597, 63d Cong., 2d Sess., 13 (1914), presents the reasoning that led the Senate Committee to avoid the temptations of precision when framing the Trade Commission Act:

> "The committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce and to forbid their continuance or whether it would, by a general declaration condemning unfair practices, leave it to the commission to determine what practices were unfair. It concluded that the latter course would be the better, for the reason, as stated by one of the representatives of the Illinois Manufacturers' Association, that there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others."

The House Conference Report was no less explicit. "It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task." H. R. Conf. Rep. No. 1142, 63d Cong., 2d Sess., 19 (1914). See also Rublee, The Original Plan and Early History of the Federal Trade Commission, 11 Acad. Pol. Sci. Proc. 666, 667 (1926); Baker & Baum, Section 5 of the Federal Trade Commission Act: A Continuing Process of Redefinition, 7 Vill. L. Rev. 517 (1962).

Since the sweep and flexibility of this approach were thus made crystal clear, there have twice been judicial attempts to fence in the grounds upon which the FTC might rest a finding of unfairness. In *FTC* v. *Gratz*, 253 U. S. 421 (1920), the Court over the strong dissent of Mr. Justice Brandeis (who had been involved in drafting the Trade Commission Act), wrote that while the "exact meaning" of the phrase " 'unfair method of competition'. . . is in dispute," the only practices that were subject to this characterization were those that were "heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." *Id.*, at 427. This view was reiterated in other opinions over the next decade. See, *e. g.*, *FTC* v. *Curtis Publishing Co.*, 260 U. S. 568 (1923), and *FTC* v. *Sinclair Refining Co.*, 261 U. S. 463, 475–476 (1923). The opinion of the Court of Appeals' majority, citing *Sinclair* in support of its narrow view of the FTC's leeway, is in the tradition of these authorities.

In *FTC* v. *Raladam Co.*, 283 U. S. 643 (1931), a unanimous Court held that: "The paramount aim of the act is the protection of the public from the evils likely to result from the destruction of competition or the restriction of it in a substantial degree . . . . Unfair trade methods are not *per se* unfair methods of *competition.*" (Italics in original.) "It is obvious," the Court continued,

> "that the word 'competition' imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors— that is to say, the trader whose methods are assailed as unfair must have present or potential rivals in trade whose business will be, or is likely to be,

lessened or otherwise injured. It is that condition of affairs which the Commission is given power to correct, and it is against that condition of affairs, and not some other, that the Commission is authorized to protect the public. . . . If broader powers be desirable they must be conferred by Congress." *Id.*, at 647–649.

Neither of these limiting interpretations survives to buttress the Court of Appeals' view of the instant case. Even if the first line of cases, *Gratz* and its progeny, stood unimpaired, their deference to action taken to constrain "deception, bad faith, fraud or oppression" would grant the FTC greater power to set right what it perceives as wrong than the panel of the Court of Appeals acknowledges. But frequent opportunity for reconsideration has consistently and emphatically led this Court to the view that the perspective of *Gratz* is too confined. As we recently unanimously observed: "Later cases of this Court . . . have rejected the *Gratz* view and it is now recognized in line with the dissent of Mr. Justice Brandeis in *Gratz* that the Commission has broad powers to declare trade practices unfair." *FTC* v. *Brown Shoe Co.*, 384 U. S. 316, 320–321 (1966).

The leading case that recognized a role for the FTC beyond that mapped out in *Gratz*, *FTC* v. *R. F. Keppel & Bro., Inc.*, 291 U. S. 304 (1934), also brought *Raladam* into question; on both counts it sets the standard by which the range of FTC jurisdiction is to be measured today. Keppel & Brothers sold penny candies in "break and take" packs, a form of merchandising that induced children to buy lesser amounts of concededly inferior candy in the hope of by luck hitting on bonus packs containing extra candy and prizes. The FTC issued a cease-and-desist order under § 5 on the theory that the popular marketing scheme con-

travened public policy insofar as it tempted children to gamble and compelled those who would successfully compete with Keppel to abandon their scruples by similarly tempting children.

The Court had no difficulty in sustaining the FTC's conclusion that the practice was "unfair," though any competitor could maintain his position simply by adopting the challenged practice. "[H]ere," the Court said, "the competitive method is shown to exploit consumers, children, who are unable to protect themselves .... [I]t is clear that the practice is of the sort which the common law and criminal statutes have long deemed contrary to public policy." *Id.*, at 313.

En route to this result the Court met Keppel's arguments that, absent an antitrust violation or at least incipient injury to competitors, *Gratz* and *Raladam* so straitjacketed the FTC that the Commission could not issue a cease-and-desist order proscribing even an immoral practice. It held:

> "Neither the language nor the history of the Act suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories. The common law afforded a definition of unfair competition and, before the enactment of the Federal Trade Commission Act, the Sherman Act had laid its inhibition upon combinations to restrain or monopolize interstate commerce which the courts had construed to include restraints upon competition in interstate commerce. It would not have been a difficult feat of draftsmanship to have restricted the operation of the Trade Commission Act to those methods of competition in interstate commerce which are forbidden at common law or which are likely to grow into violations of the Sherman Act, if that had been the purpose of the legislation." *Id.*, at 310.

Thenceforth, unfair competitive practices were not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws; nor were unfair practices in commerce confined to purely competitive behavior.

The perspective of *Keppel,* displacing that of *Raladam,* was legislatively confirmed when Congress adopted the 1938 Wheeler-Lea amendment, 52 Stat. 111, to § 5. The amendment added the phrase "unfair or deceptive acts or practices" to the section's original ban on "unfair methods of competition" and thus made it clear that Congress, through § 5, charged the FTC with protecting consumers as well as competitors. The House Report on the amendment summarized congressional thinking: "[T]his amendment makes the consumer, who may be injured by an unfair trade practice, of equal concern, before the law, with the merchant or manufacturer injured by the unfair methods of a dishonest competitor." H. R. Rep. No. 1613, 75th Cong., 1st Sess., 3 (1937). See also S. Rep. No. 1705, 74th Cong., 2d Sess., 2–3 (1936).

Thus, legislative and judicial authorities alike convince us that the Federal Trade Commission does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally mandated standard of fairness, it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws.[5]

---

[5] The Commission has described the factors it considers in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is nonetheless unfair:

"(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law,

## III

The general conclusion just enunciated requires us to hold that the Court of Appeals erred in its construction of § 5 of the Federal Trade Commission Act. Ordinarily we would simply reverse the judgment of the Court of Appeals insofar as it limited the unfair practices proscribed by § 5 to those contrary to the letter and spirit of the antitrust laws and we would remand the case for consideration of whether the challenged practices, though posing no threat to competition within the precepts of the antitrust laws, are nevertheless either (1) unfair methods of competition or (2) unfair or deceptive acts or practices.

What we deem to be proper concerns about the interaction of administrative agencies and the courts, however, counsels another course in this case. In this Court the Commission argues that, however correct the Court of Appeals may be in holding the challenged S&H practices beyond the reach of the letter or spirit of the antitrust laws, the Court of Appeals nevertheless

---

statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking. 29 Fed. Reg. 8355 (1964).

S&H argues that a later portion of this statement commits the FTC to the view that misconduct in respect of the third of these criteria is not subject to constraint as "unfair" absent a concomitant showing of misconduct according to the first or second of these criteria. But all the FTC said in the statement referred to was that "[t]he wide variety of decisions interpreting the elusive concept of unfairness *at least* makes clear that a method of selling violates Section 5 if it is exploitive or inequitable and if, in addition to being morally objectionable, it is seriously detrimental to consumers or others." *Ibid.* (emphasis added).

erred in asserting that the FTC could measure and ban conduct only according to such narrow criteria. Proceeding from this premise, with which we agree, the Commission's major submission is that its order is sustainable as a proper exercise of its power to proscribe practices unfair to consumers. Its minor position is that it also properly found S&H's practices to be unfair competitive methods apart from their propriety under the antitrust laws.

The difficulty with the Commission's position is that we must look to its opinion, not to the arguments of its counsel, for the underpinnings of its order. "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands." *Investment Co. Institute* v. *Camp,* 401 U. S. 617, 628 (1971). We cannot read the FTC opinion on which the challenged order rests as premised on anything other than the classic antitrust rationale of restraint of trade and injury to competition.

The Commission urges reversal of the Court of Appeals and approval of its own order because, in its words, "[t]he Act gives the Commission comprehensive power to prevent trade practices which are deceptive or unfair to consumers, regardless of whether they also are anticompetitive." Brief for the FTC 15. It says the Court of Appeals was "wrong in two ways: you can have an anticompetitive impact that is not a violation of the antitrust laws and violate Section 5. You can also have an impact upon consumers without regard to competition and you can uphold a Section 5 violation on that ground." Tr. of Oral Arg. 18. Though completely accurate, these statements cannot be squared with the Commission's holding that "[i]t is essential in this matter, we believe, and as we have heretofore indicated, to determine whether or not there has been or may be an

impairment of competition," Opinion of Commission, 1 App. 175; its conclusion that "[r]espondent . . . prevents . . . competitive reaction[s] and thereby it has restrained trade. We believe this is an unfair method of competition and an unfair act and practice in violation of Section 5 of the Federal Trade Commission Act and so hold," 1 App. 178; its observation that:

> "Respondent's individual acts and its acts with others taken to suppress trading stamp exchanges and other stamp redemption activity are all part of a clearly defined restrictive policy pursued by the respondent. In the circumstances surrounding this particular practice it is difficult to wholly separate the individual acts from the collective acts for the purpose of making an analysis of the consequences under the antitrust laws." 1 App. 179;

and like statements throughout the opinion, see, *e. g.,* 1 App. 176–178, *passim.*

There is no indication in the Commission's opinion that it found S&H's conduct to be unfair in its effect on competitors because of considerations other than those at the root of the antitrust laws.[6] For its part, the

---

[6] The Commission did explicitly decline to assess S&H's conduct in light of one leading antitrust case. In *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365, 379 (1967), this Court held that: "Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. *White Motor* [v. *United States,* 372 U. S. 253 (1963)]; *Dr. Miles* [*Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373 (1911)]. Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale."

Arguably, S&H's practice is proscribed by this doctrine. When the FTC declined to rely on this precedent, however, it did so not

theory that the FTC's decision is derived from its concern for consumers finds support in only one line of the Commission's opinion. The Commission's observation that S&H's conduct limited "stamp collecting consumers' . . . freedom of choice in the disposition of trading stamps," 1 App. 176, will not alone support a conclusion that the FTC has found S&H guilty of unfair practices because of damage to consumers.

Arguably, the Commission's findings, in contrast to its opinion, go beyond concern with competition and address themselves to noncompetitive and consumer injury as well. It may also be that such findings would have evidentiary support in the record. But even if the findings were considered to be adequate foundation for an opinion and order resting on unfair consequences to consumer interests, they still fail to sustain the Commission action; for the Commission has not rendered an opinion which, by the route suggested, links its findings and its conclusions. The opinion is barren of any attempt to rest the order on its assessment of particular competitive practices or considerations of consumer interests independent of possible or actual effects on competition. Nor were any standards for doing so referred to or developed.

---

to turn to considerations other than those embedded in the antitrust laws, but instead to look for considerations less "technical" and more deeply rooted in antitrust policy:

"We do not believe it appropriate to decide the broad competitive questions presented in this record on the narrow and technical basis of a restraint on alienation. The circumstances here are much different from that where products are transferred to a dealer for resale. They are complicated by the nature of the trading stamp scheme. It is essential in this matter, we believe, and as we have heretofore indicated, to determine whether or not there has been or may be an impairment of competition. Thus, we intend to look at the substance of the allegedly illegal practice rather than to decide the case by application of a technical formula." 1 App. 175–176.

Our view is that "the considerations urged here in support of the Commission's order were not those upon which its action was based." *SEC* v. *Chenery Corp.*, 318 U. S. 80, 92 (1943). At the least the Commission has failed to "articulate any rational connection between the facts found and the choice made." *Burlington Truck Lines* v. *United States*, 371 U. S. 156, 168 (1962).

The Commission's action being flawed in this respect, we cannot sustain its order. "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *Chenery, supra,* at 94. *Burlington Truck Lines, supra,* at 169. A court cannot label a practice "unfair" under 15 U. S. C. § 45 (a)(1). It can only affirm or vacate an agency's judgment to that effect. "If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment." *Chenery, supra,* at 88. And as was repeated on other occasions:

> "For the courts to substitute their or counsel's discretion for that of the Commission is incompatible with the orderly functioning of the process of judicial review. This is not to deprecate, but to vindicate (see *Phelps Dodge Corp.* v. *Labor Board*, 313 U. S. 177, 197), the administrative process, for the purpose of the rule is to avoid 'propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.' 332 U. S., at 196." *Burlington Truck Lines, supra,* at 169.

In these circumstances, because the Court of Appeals' judgment that S&H's practices did not violate either the letter or the spirit of the antitrust laws was not attacked and remains undisturbed here, and because the Commis-

sion's order could not properly be sustained on other grounds, the judgment of the Court of Appeals setting aside the Commission's order is affirmed. The Court of Appeals erred, however, in its construction of § 5; had it entertained the proper view of the reach of the section, the preferable course would have been to remand the case to the Commission for further proceedings. *Chenery, supra,* at 95; *Burlington, supra,* at 174; *FPC* v. *United Gas Pipe Line Co.,* 393 U. S. 71 (1968). Accordingly, the judgment of the Court of Appeals is modified to this extent and the case is remanded to the Court of Appeals with instructions to remand it to the Commission for such further proceedings, not inconsistent with this opinion, as may be appropriate.

*So ordered.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.