[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This litigation consists of two separate cases which have been consolidated for the purposes of trial and disposition of the claims of the parties. These cases arise out of Star Enterprise's attempt to exercise an option to purchase property located at the intersection of Routes 7 and 25 in Brookfield, Connecticut (the "Property").
The case entitled Star Enterprise v. Hanna and Talarico, Trustess, Docket No. CV89-0297862 S was commenced on March 29, 1989. In that action, the plaintiff, Star Enterprise, seeks, in addition to damages and attorneys' fees, a decree in equity directing the defendants, Hanna and Talarico, Trustees, to convey the Property to it.
The case entitled Hanna and Talarico, Trustees v. Texaco, Inc., Docket No. CV90-0303949 S was commenced on December 4, 1990. In that action, the plaintiffs, Hanna and Talarico, as Trustees for the Norbert Mitchell Company, seek a declaratory judgment that Texaco, Inc. has waived and/or released its option to purchase the Property. The option is set out in a Lease Agreement dated December 22, 1964. Hanna and Talarico also seek damages and attorneys' fees.
Pursuant to an agreement of the parties, the evidence presented at the Star trial applies to, and is determinative of, the claims of all parties in each of these two cases. From that evidence, including a stipulation of facts dated April 10, 1992, the court finds the following:
On or about December 22, 1964, the owner of the Property, Helen K. Teipel, as lessor, and Texaco, Inc., a Delaware corporation, as lessee, entered into a written lease agreement ("Lease") regarding the property. The Lease provides, inter alia, that a service station was to be constructed on the Property and, thereafter, was to be occupied by Texaco. With regard to the options, in pertinent part, it provides that:
 Lessor hereby grants to lessee the exclusive right at lessee's option to purchase the demised premises, together with all structures, improvements and equipment thereon, free and clear CT Page 1789 of all liens and encumbrances (including leases which were not on the premises at the date of this lease) at any time during the term of this lease or any extension or renewal thereof,
 (a) for the sum of One Hundred Fifty Thousand Dollars ($150,000.00) during 15th year of lease or any extension thereof, it being understood that if any part of said premises be condemned, the amount of damages awarded to or accepted by Lessor as a result thereof shall be deducted from said sum; (b) on the same terms and at the same price as any bona fide offer for said premises received by lessor in which offer lessor desires to accept. Upon receipt of a bona fide offer, and each time any such offer is received, lessor shall immediately notify lessee in writing of the full details of said bona fide offer, including the name and address of the offeror, whereupon lessee shall have thirty (30) days after receipt of such notice in which to elect to exercise lessee's prior right to purchase. No sale of or transfer of title to said premises shall be binding on lessee unless and until the foregoing requirements are fully complied with. If lessee elects to exercise lessee's prior right to purchase pursuant to any such bona fide offer, it is agreed that the terms and conditions set forth in the next to last paragraph shall govern such purchase.
 Each such option herein granted shall be independent of the other, shall be pre-emptive and continuing, and shall be binding upon lessor, lessors heirs, devisees, legal representatives, successors and assigns. The election by lessee not to purchase said premises in the case of any bona fide offer referred to in (b) above shall not terminate or in any wise [sic] affect either of such options but each shall thereafter continue unaffected as set forth in this paragraph."
The Lease also provides that the lessee has the right and option to extend the lease for two additional periods of five years each at the same rental as set forth in the Lease.
The terms of the five year extensions commenced on CT Page 1790 October 18, 1980 and October 18, 1985.
The parties executed a Memorandum of Lease dated December 22, 1964 that makes reference, among other things, to the lessee's option to purchase the property. Said memorandum was recorded in Volume 65 at page 259 of the Brookfield Land Records on March 18, 1965.
Following the completion of the construction of the service station facility on the property, Teipel and Texaco agreed that the effective date of the Lease was established as October 18, 1965; consequently, the initial fifteen year term commenced on October 18, 1965. On June 4, 1980, Texaco exercised its option to extend the Lease for an additional five year period, commencing October 18, 1980 through October 17, 1985.
In early 1981, while at the Danbury Club, Desmond J. Hynes, a Texaco Real Estate Agent assigned to the Fairfield County area, approached a fellow club member and long time acquaintance, Joseph Rotella, with regard to the availability of the subject Property. Hynes was aware that Rotella, a licensed real estate broker, had been involved with buying and selling gasoline service station sites in the past. Hynes, who Rotella believed was representing the owner and potential seller, Mrs. Teipel, indicated that she would sell the site for $120,000. Rotella, after being told of the amount of the monthly rental and of the options contained in the lease encumbering the Property, indicated that he was not interested in acquiring same.
Hynes then asked if Rotella knew of anyone who might be interested and Rotella stated that perhaps Norbert E. Mitchell would consider acquiring the site. Hynes told Rotella to add $10,000 to the purchase price as a finder's fee in case a sale was affected.
Approximately one week later, at a chance meeting, Rotella informed Norbert E. Mitchell that the property was available and that he should contact Hynes if interested. Rotella thereafter had no further involvement in the transaction until after the purchase of the Property by the Mitchells. After learning that the Property was available, Norbert E. Mitchell, Sr., and his son, Norbert E. Mitchell, Jr., discussed the possibility of acquiring same and decided CT Page 1791 to contact Hynes. Thereafter, they discussed the possibility of purchasing the Property directly with Hynes on several occasions. The Mitchells believed that the Property was a good service station location and could produce good retail gasoline sales volumes for the Mitchell Company.
The Mitchells were partners, with others, in the Norbert E. Mitchell Company, a business involved with the sale and distribution of petroleum products that owned a number of retail gasoline service stations and was looking to expand its retail network.
During their discussions with Hynes, the Mitchells made it known that they had no interest in merely purchasing the property for the purpose of acting as landlord.
After learning from Hynes that the purchase price was $110,000, the Mitchells contacted their attorneys, Hanna and Talarico, and were instructed to obtain a map of the property and a copy of the Lease with Texaco. These were produced and after review the Mitchells made it known to Hynes that they had no interest in purchasing the Property unless Texaco released its option to purchase. Hynes represented to the Mitchells, on several occasions, that Texaco had no intent of exercising, and would release their options, including the option to purchase because gasoline sales from the site were not sufficient, and Texaco therefore had no interest in continuing the station.
Hynes also informed the Mitchells that "Texaco needed $20,000.00 in order to put the deal through for them" and that title should be taken in the names of trustees.
On January 30, 1981, Attorney Robert N. Talarico wrote to Helen K. Teipel to communicate an unconditional offer to purchase, for $110,000.00, the "Texaco Service Station, corner U.S. Route #7 and State Highway #25, Brookfield, CT." This offer was made "on behalf of Richard Hanna, Trustee and/or Robert N. Talarico, Trustee."
As required by the Lease, Teipel's attorney informed Texaco by letter dated February 23, 1981 of the terms of this offer. Texaco employees, including Hynes, his supervisor, Fiorentine, and some of Texaco's marketing people reviewed the offer. It was decided not to exercise the first right of CT Page 1792 refusal on this offer for two reasons. One, there was a question as to the future viability of the location as a retail gas station and, two, Texaco not only had a guaranteed tenancy for a long period of time, but also had an option to purchase the property for the fixed purchase price of $150,000.00 that it could exercise at any time during its tenancy.
Mrs. Teipel's attorney was informed of this decision by letter dated March 10, 1981 from Texaco's New York Division Manager. The letter also noted that "any subsequent sale is also subject to our continuing pre-emptive rights to purchase." (Plaintiff's Exhibit F.)
On May 4, 1981, by Warranty Deed recorded in Vol. 138 at page 1059 of the Brookfield Land Records, Helen K. Teipel conveyed her interest in the property subject to the Lease, to the defendants, Richard Hanna, Trustee and Robert N. Talarico, Trustee, for the sum of $110,000. The deed provided that the Property was conveyed subject to "a certain Memorandum of Lease between the Grantor herein and Texaco, Inc. dated December 22, 1964 and recorded in Volume 65 at Page 258 of the Brookfield Land Records and further subject to the Lease therein described, as amended." As stated earlier, the Memorandum of Lease provides that the Lease "contained an option to Lessee to purchase said premises."
In conjunction with the transfer of title, Teipel also assigned her interests in the Lease with Texaco to Hanna and Talarico, Trustees.
In addition to being trustees for the Norbert E. Mitchell Company, actually a partnership at the time, Hanna and Talarico represented the Mitchells. While it was customary for the Mitchells to allow their attorneys to handle all aspects of title closings, in this instance they closed without obtaining releases of Texaco's options to renew or to purchase as its first right of refusal. Instead, the Mitchells opted to rely on a $20,000 payment to be made to Hynes to secure the desired releases.
Several days after closing of title, Hynes contacted the Mitchells regarding the agreed upon $20,000 payment and for the first time indicated that the payment would have to be made in cash. Although the Mitchells considered the request CT Page 1793 for payment in cash to be strange, they still claimed that they believed Texaco would provide them with releases of the options upon payment.
Pursuant to Hynes' request for payment on May 5, 1981, Norbert E. Mitchell, Sr. took a $20,000 check of the Norbert Mitchell Company and cashed it at his bank. He then placed the cash in a manila envelope and brought it to the Danbury Club where he handed it to Joseph J. Rotella who had been asked by Hynes to accept the envelope from Mitchell. Later that day, when Hynes arrived at the Danbury Club, Rotella delivered the envelope to Hynes who took out ten packets of $1,000 each and gave them to Rotella. Hynes retained the balance of $10,000 for his own use.
The Mitchell Company declared the $20,000 payment as part of the acquisition cost of the property. This was done at the suggestion of the company's accountant who was contacted by Norbert E. Mitchell, Jr. regarding the legality of the cash payment to Hynes.
By letter dated January 2, 1985, notice was given to Hanna and Talarico in accordance with the terms of the Lease, that Texaco, Inc. assigned its rights and interest in the Lease to its wholly owned subsidiary, Texaco Refining and Marketing, Inc. ("TRMI") effective December 31, 1984. The written assignment of Lease executed October 26, 1988, by its terms became effective as of December 31, 1984.
Thereafter, in a letter dated January 14, 1985, L.B. Jackson, Division Manager, informed Hanna and Talarico that TRMI "formerly known as Texaco, Inc.," exercises its option to extend the term of its tenancy for a period of five years, from and after October 18, 1985.
On January 7, 1988, TRMI notified Hanna and Talarico, Trustees of its election to exercise the fixed price purchase option to purchase the Property for the sum of $150,000 pursuant to the terms and conditions stated in the Lease. Receiving no response from the property owners, on July 12, 1988, TRMI again demanded performance by the lessors of their obligations under the Lease. On October 24, 1988, TRMI notified Hanna and Talarico, Trustees of its readiness to proceed with the purchase of the Property, to no avail. CT Page 1794
Then, by letter dated November 10, 1988, Hanna and Talarico's attorney advised Texaco that the extensive and unauthorized renovations altering the character of the premises, i.e., three-bay full service station to a convenience store, that it was conducting on the property, were in violation of the Lease and would have to stop. Further, he requested a meeting to discuss Texaco's attempts to exercise its option because he believed that it was "without right to purchase the property."
On March 20, 1989, Hanna and Talarico, Trustees caused Texaco, Inc. to be served with a notice to quit possession of the Property.
By instrument dated December 31, 1988 and recorded in the Brookfield Land Records on April 20, 1989, TRMI assigned its interest in the Lease to the plaintiff, Star Enterprise.
On March 29, 1989, Star Enterprise, as the assignee of the lease rights of Texaco, Inc., through the assignee/assignor TRMI (a partner in the Star Enterprise General Partnership) commenced the instant proceeding, seeking specific performance of the claimed option to purchase pursuant to this court's equitable powers. In addition, on March 31, 1989 a notice of lis pendens that had been served on Hanna and Talarico was filed in the Brookfield Land Records.
On December 4, 1990, Hanna and Talarico, as trustees for the Norbert E. Mitchell Company, commenced the present action seeking in addition to a declaratory judgment that Texaco, Inc. had waived and/or released its option to purchase rights, damages and attorneys' fees.
In their special defenses of May 2, 1989, Hanna and Talarico assert that Star (including its assignor) is either estopped from obtaining specific performance of the option or has waived or released any rights which it may have had as a result of the activities of its authorized representative. These special defenses are based upon the alleged actions of Hynes relative to the defendants' purchase of the subject property.
The Mitchells claim that at all times they believed that they were dealing with Hynes as Texaco's authorized real CT Page 1795 estate representative; that they relied upon his representations that Texaco was not interested in purchasing the Property; that the options would be released in consideration of $20,000 payment; and that he would take care of everything. Further, they claim that they would not have purchased the property if Hynes had not made these representations.
It is undisputed that Desmond J. Hynes was a real estate agent for Texaco at all times in question; however, a dispute does arise as to whether his representations to the Mitchells were made within the scope of his authority.
It is interesting to note that during his entire period of employment as a real estate agent, he seemed to perform his job properly and Texaco never received a complaint or was ever made aware that he at any time exceeded his authority until the present situation was made known. Hynes retired from Texaco in 1987.
"Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principals' manifestations of consent to him." Restatement of Agency (Second), Sec. 7.
In the present case, the transcript of Mr. Anthony Fiorentine, Hynes' immediate supervisor, at all times pertinent hereto, indicates that Hynes was employed by Texaco as a full-time salaried real estate agent from 1980 through 1987. Hynes, while responsible for recommending to his superiors, for their review and decision, gas station sites for acquisition, negotiating the terms of leases, property sales and purchases, was not empowered to bind Texaco or authorized to sign any documents on its behalf. Although he was authorized to accept money for Texaco, such as proceeds of sale from closings that he attended as its real estate representative, he was required to forward such proceeds directly to Texaco's accounting department.
Certainly, Hynes was aware that Texaco did not release or authorize him to release its options to renew or purchase. He was also aware that Texaco neither authorized him nor led him to believe that he was authorized to represent to the Mitchells that releases would be provided at any price. It can safely be concluded that Hynes undertook to make the CT Page 1796 representations complained of without actual authority, and requested and retained the $20,000 cash payment for his own purposes.
Under the common law, the doctrine of apparent authority has developed "to protect, under proper circumstances, a third person in his dealings with an agent who lacks express authority." Edart Truck Rental Corporation v. B. Swirsky 
Co., Inc., 23 Conn. App. 137, 140 (1990), quoting Keeler v. General Products, Inc., 137 Conn. 247, 251 (1950).
"Apparent authority is derived not from the acts of the agent but from the deliberate or inadvertent acts of the principal." (Citations omitted.)
 Apparent authority has two elements. First, it must appear from the acts of the principal that `the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority . . . .' Nowak v. Capitol Motors, Inc., 158 Conn. 65, 69, 255 A.2d 845
(1969). Second, the party seeking to bind the principal must have acted in good faith reliance on that appearance of authority.
Edart Truck Rental Corporation v. B. Swirsky Co., Inc., supra, 139, 140.
Additionally, a party dealing with a known agent has a duty to ascertain whether that agent is acting within the scope of his authority. Hollywyle Assn., Inc. v. Hollister,164 Conn. 389, 397 (1973).
The defendants, Hanna and Talarico, Trustees, have failed to show that Texaco held Hynes out as possessing sufficient authority to enter into any contract or to execute any instruments on its behalf, or to convey its interest in any property or to bind it by his representations regarding release or to seek and/or obtain any funds for the release of any of its options. Defendants failed to meet their burden of proof because the Mitchells' knowledge of Hynes' job with Texaco and the scope of his duties and responsibilities is not derived from some act, deliberate or inadvertent, of Texaco, but from conjecture, surmise and what they gathered from Hynes himself at social meetings over the years. With CT Page 1797 the exception of one occasion when Hynes, accompanied by his supervisor and one or two others, met with the Mitchells to discuss Texaco's interest in some of their retail gasoline station sites, all other contacts were of a social nature, nothing having come of the one business meeting.
The Mitchells and Desmond Hynes were friends for approximately ten years. They all belonged to the Danbury Club where they met and socialized quite often. They also belonged to the Ridgewood Country Club in Danbury, where they occasionally played golf together. While Norbert Mitchell, Sr. played golf with Hynes and dines with him occasionally, Norbert Mitchell, Jr. socialized more extensively with him. He and Hynes often watched Monday night football on T.V. together at the Danbury Club or at a friend's home with eight or ten other men. They also played cards on some Monday evenings and, in season, occasionally play golf together at the Ridgewood.
As Norbert Mitchell, Sr. indicated when asked if he knew what Hynes' job with Texaco was, he answered, "anybody that knew Desi knew what his job was," not that he told everyone, it was just that "[w]ell, everybody just knew it." (T. 1 pp. 80-81.) When asked why he relied on Hynes, Mr. Mitchell, Sr. said "[h]e just said he's taking care of everything and we'd get the property, that's all." Questioned on why he believed Hynes, Mr. Mitchell responded, "Because of his character and all, and I — he represented Texaco." (T. 1 p. 84.)
Further, it's clear that Texaco wasn't aware that Hynes was in any way involved with the sale of the Property and never knowingly permitted him to make any representations to the Mitchells with regard to same.
As to the question of good faith reliance on the part of the Mitchells, the court is of the opinion that it would have been apparent to anyone exercising due diligence that Hynes was not acting for the benefit of Texaco in this transaction. As Mr. Rotella understood, Texaco, Inc. would receive no benefit if Mrs. Teipel sold the Property. Similarly, Hynes' suggestion that the Property be taken in the name of a trustee so that his employer would be unaware of the true identity of the purchaser would cause anyone of reasonable prudence and good faith to believe that he was not acting on behalf of Texaco. Finally, the Mitchells were not aware of CT Page 1798 Hynes' job description or specific job responsibility. Under similar circumstances, an ordinary business person, acting in good faith and with due diligence, would have serious doubts about an agent's authority and would ascertain whether the agent was in fact acting within that scope. As noted earlier herein, both of the Mitchells are experienced businessmen. Norbert E. Mitchell, Sr., in particular, has considerable experience. In 1981, he had been in his own petroleum distribution business for thirty-five years. He had been involved in a number of real estate developments in the area and his company had purchased and developed a number of gasoline service station sites.
Norbert E. Mitchell, Jr., while his business experience at the time was not as extensive as his fathers, was a partner in and general manager of the Norbert Mitchell Company and had been involved in several real estate transactions.
With all of the business acumen and experience possessed by the Mitchells, it would not be unreasonable to expect them to make reasonable inquiry into Hynes' duties and authority or lack thereof as it related to the sale and purchase of the Property. However, they did nothing. The Mitchells' behavior, as viewed in this light, is at best suspect and it does not appear that they have acted in good faith.
Further, the court finds that the defendants have failed to show that Texaco or its assignees deliberately or inadvertently held Hynes out as possessing sufficient authority to embrace the acts in question, or knowingly permitted him to act as having such authority.
Additionally, suffice it to say that defendants have failed to prove that either Texaco or its assignees ever intended to waive or relinquish their rights under the purchase option. Nor did they make any representation to the Mitchells or undertake any action to mislead them or to induce them to act to their detriment. Actually, the Mitchells deliberately avoided contacting Texaco and only dealt with Hynes, who was acting for his own benefit and was concealing the true nature of the transaction from Texaco.
When this is considered in conjunction with the findings that Hynes lacked actual or apparent authority and that the CT Page 1799 Mitchells did not act in good faith, defendants' special defenses must and do fail.
In view of the foregoing findings, the defendants' first counterclaim, having as its basis fraudulent misrepresentation, is also nonavailing. Any misrepresentation made to the Mitchells was made by Desmond Hynes and not by Texaco as its assignee. Therefore, vis-a-vis Texaco and assignees, any reliance by the Mitchells on those misrepresentations was not justifiable and to be actionable such reliance must be justifiable under the circumstances. Maturo v. Gerard, 196 Conn. 584, 589 (1985).
As to the second counterclaim in which defendants allege a CUTPA violation, Connecticut Unfair Trade Practices Act, Sec. 42-110(a) et seq., the defendants have failed to prove that Texaco or its assignees engaged in any immoral, unethical, oppressive or unscrupulous practice as an essential factor in the proof of a CUTPA violation. F.T.C. v. Sperry and Hutchinson Co., 405 U.S. 233, 244 (1972) (n. 5).
The third and fourth counterclaims allege breach of lease and seek possession of the premises and damages, respectively.
Again, in view of the court's earlier findings, it is the plaintiff that has a prior right to title and exclusive possession of the premises and, therefore, was well within its rights when effecting the renovations to the Property.
The foregoing findings also apply to the case Hanna and Talarico, Trustees v. Texaco, Inc., and dispose of count one of plaintiffs' complaint, based on fraudulent misrepresentation; count two alleging breach of an oral contract; count four claiming breach of lease; count six based on equitable estoppel; and count seven claiming a CUTPA violation.
In count three, plaintiffs claim relief under a theory of unjust enrichment. In order to recover, the plaintiffs must establish two elements: (1) that Texaco received something of value; (2) that the benefit was received to the detriment of the plaintiffs. See Providence Electric Co. v. Sutton Place, Inc., 161 Conn. 242, 246 (1971). Because unjust enrichment is an equitable remedy, it becomes CT Page 1800 necessary whenever the doctrine is claimed to examine the conduct of all parties involved. Id. This has already been accomplished in this Memorandum of Decision and since Texaco received nothing of value, although the Mitchells did pay $20,000 to Hynes who then divided it with Rotella, the plaintiffs have failed to establish that Texaco was unjustly enriched.
In count five, the plaintiffs allege negligent supervision of Desmond Hynes by Texaco. As argued by the defendant, the plaintiffs have not proved their allegations, specifically, the allegation that Texaco knew that Hynes was holding himself out as an authorized representative and accepting money on its behalf.
Further, as to the claim that Texaco, had it exercised reasonable diligence, would or should have known what Hynes was doing, plaintiff has failed to prove that Texaco did not use reasonable diligence or that it should have been aware of his unauthorized activity. As a matter of fact, Hynes and the Mitchells took elaborate precautions to keep Texaco from learning the true nature of the transaction.
In light of the above, it appears to the court that the option to purchase contained in the Lease is specifically enforceable because it is legally valid as well as fair and reasonable. Further, the defendant, Star Enterprise, stands ready, willing and able to perform its obligation under the option agreement.
Therefore, in accordance with the foregoing, it is the judgment of this court that in the case entitled Star Enterprise v. Richard Hanna and Robert N. Talarico, Trustees, Docket No. CV89-0297862 S, the defendants specifically perform the option agreement contained in paragraph 10 of the written lease agreement originally made by and between Helen K. Teipel, as lessor, and Texaco, Inc., as lessee and convey the premises described therein, under the terms of such option, to the plaintiff forthwith. This judgment may enter in favor of the plaintiff together with statutory costs of suit.
Further, the court finds for the plaintiff on each of defendants' counterclaims and judgment may enter accordingly. CT Page 1801
With respect to the case entitled Richard Hanna and Robert N. Talarico Trustees v. Texaco Inc. Docket No. CV90-0303949 S, judgment may enter for the defendant, Texaco, Inc., on all counts of plaintiffs' complaint.
West, J.