[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. INTRODUCTION
On the evening of August 16, 1991, the plaintiff attended her sister's wedding. At approximately 11:00 that night, while the plaintiff was celebrating with her sister, an agent of the defendant entered plaintiff's cellar and without her CT Page 11343 permission removed over forty boxes of personal possessions as well as an antique brass bed, her mother's dining room set and her fiancee's nine thousand dollar sound system. Also lost were countless, but irreplaceable personal items comprising memories of her childhood and the lives of her children. This case concerns the extent to which the plaintiff should be compensated for the value of the items lost and for the emotional trauma she suffered.
Plaintiff's eight count complaint alleges, inter alia, a violation of the entry and detainer statute, unlawful entry, theft, negligent and intentional infliction of emotional distress and a violation of the Connecticut Unfair Trade Practices Act. In addition to compensation for actual damages, plaintiff seeks punitive damages and attorney's fees. With respect to the entry and detainer claim, the Court, Berger, J., found a violation of General Statutes 47a-43(a) (2) and (3) and continued the matter for a hearing in damages.[1] For the reasons set forth below, defendant's action constitute not only a violation of the entry and detainer statute, but also an unfair trade practice and negligent infliction of emotional distress.
II. FINDINGS OF FACT
1. On May 1, 1991, the Plaintiff and her three children took possession of the second floor apartment of 47-49 Whiton Street, Windsor Locks, Connecticut, pursuant to a month-to-month rental agreement with Frederick Ramsey who owned the premises.
2. In addition to the living area on the second floor, Plaintiff's lease included the use of the cellar, which she was to share with the first floor tenants of the house.
3. The cellar ran the length of the house and both the first and second floor tenants had access to the cellar from their units.
4. During Plaintiff's tenancy, the cellar was predominantly free of garbage and debris.
5. On May 1, 1991, Plaintiff was 36 years of age, her son, Christopher, was 10, her daughter, Michelle was 8 and her daughter, Leigh Anne, was 2. CT Page 11344
6. Immediately prior to May 1, 1991, Plaintiff and her three children resided at Trinity Lane in Windsor Locks in a house that was considerably larger than the Whiton Street house.
7. Shortly after moving into the premises, Plaintiff learned that 47-49 Whiton Street was the subject of a foreclosure action and that title to the property was in question. Ultimately, the Defendant took title on July 31, 1991.
8. Beginning when she first moved in and continuing through mid May, 1991, Plaintiff began placing her personal. property in the cellar portion of the premises in contemplation of her moving from the premises and because she was unable to fit her belongings in the living area.
9. By the end of May, 1991, most of the Plaintiff's property identified in Plaintiff's Exhibit A was located in the cellar. The remaining property listed in Plaintiff's Exhibit A was placed there by August 16, 1991. This property consisted of adult and children's clothing, Christmas decorations memorabilia household furnishings, a bedroom and dining room set, a sound system and other miscellaneous personal possessions.
10. Much of the Plaintiff's property was stored in approximately 40 boxes, many of which were sealed and labeled. Other larger items were placed in Plaintiff's one-half of the cellar and were separated from the property also stored in the cellar by the first floor tenant, Kim Miele.
11. In May and June, 1991, the Plaintiff and the first floor tenant were both frequently in the cellar sometimes one to two times per week.
12. The first floor tenants, Kim Miele and her son, Anthony Miele, used the cellar to store clothing and housewares, did their laundry there and Anthony Miele often played his drum set there as well.
13. In mid June or early July, 1991, Kim and Anthony Miele vacated the premises and removed all of their property except for a few pallets. At the time they vacated, there was CT Page 11345 no other property or materials remaining in the cellar other than the Plaintiff's.
14. Beginning May 1, 1991 and continuing through mid December, 1991, Plaintiff's then fiance', Carlos Rojas, was frequently at the premises although he maintained his own residence. At the time of Plaintiff's tenancy, Plaintiff and Carlos Rojas had been in a relationship for approximately five years and had one daughter together.
15. Sometime prior to May 1, 1991, Carlos Rojas gave to Karen Weigert numerous brass items, including an antique brass bed.
16. John Koseian was the agent of the Defendant.
17. As the Defendant's agent/property manager for Whiton Street, John Koseian's responsibilities included collecting rents, maintaining the property and generally making the property presentable for resale and/or rental.
18. Mr. Koseian concluded that it was necessary to clean the basement at Whiton Street in order to prepare the house for resale.
19. Mr. Koseian discussed the cleaning of the cellar and the removal of the boxes and other items with a Mr. Marconi, a vice president of the Defendant.
20. Mr. Marconi instructed Mr. Koseian that the defendant would hire Larry Hughes to clean the cellar. Shortly thereafter Mr. Hughes contacted Koseian to request the keys.
21. Koseian did not inspect the cellar with Hughes, but instead relied on Marconi to provide Hughes with instructions.
22. On August 9, 1991, Karen Weigert and Mr. Koseian had a conversation regarding her tenancy during which she indicated that the property in the cellar was hers.
23. In early August, 1991, Defendant, Windsor Locks, hired Larry Hughes to clear out the cellar of 47-49 Whiton Street and paid for his service in connection with the removal of the property from the cellar. CT Page 11346
24. Plaintiff did not give John Koseian, Larry Hughes or any employee or agent of the Defendant permission to remove anything from her cellar.
25. During the day of August 16, 1991, Karen Weigert entered the cellar of the premises to get a pocketbook. She noticed nothing unusual about the cellar and observed that her property was intact.
26. On the evening of August 16, 1991, the Plaintiff and Carlos Rojas left the premises at approximately 6:00 p.m. to attend Ms. Weigert's sister's wedding. They travelled in a van and left Plaintiff's car in the driveway.
27. While at the wedding, Plaintiff's children were at home with a babysitter.
28. At approximately 11:00 p.m. Christopher Weigert went outside the house and observed a truck with individuals moving things behind the house.
29. On August 16, 1991, at approximately 11:00 p.m., Larry Hughes entered the cellar of Whiton Street and removed over 90% of Plaintiff's property from the cellar.
30. On August 30, 1991, Karen Weigert first determined that her property was missing from the cellar.
31. On August 20, 1991, Karen Weigert called the Windsor Locks Police Department and Officer Koistinen responded to her complaint. He then spoke with Mr. Koseian who informed him that the bank removed the property from the cellar and that it was taken to the dump. Officer Koistenen then notified Ms. Weigert that no criminal action would be taken because this was a civil matter.
32. The replacement cost of all of the items of property listed on Plaintiff's Exhibit A, excluding Roman Numerals II and III, is $18,121.00.
33. The actual cash value of all the items of property listed on Plaintiff's Exhibit A, excluding Roman Numerals II and III, is $14,908.00. CT Page 11347
34. The total market value of all the Plaintiff's brass property listed on Exhibit A, Roman Numeral III, is $9,970.00.
35. The Plaintiff also lost personal mementos and memorabilia whose monetary value is de minimis, but whose emotional value to the Plaintiff is incalculable.
36. The Plaintiff suffered and continues to suffer severe emotional trauma as a result of the loss of her property.
III. CONCLUSIONS OF LAW
1. The Defendant entered the Plaintiff's residence, removed her property and locked her out of her cellar in violation of C.G.S. 47a-43(a)(2)(3).
2. The Plaintiff suffered and continues to suffer emotional distress as a result of the acts of the Defendant.
3. The Defendant's actions were taken in the conduct of trade or commerce.
4. The Defendant's actions were unfair acts in violation of C.G.S. 42-110b.
5. The Defendant's actions were negligent in one or more of the following ways:
a. IN THAT the Defendant's agent spent only a few minutes in the cellar and failed to properly inspect and inventory the contents of the cellar.
b. IN THAT, while tenants were at home, the Defendant's agent entered the Plaintiff's cellar at approximately 11:00 p.m. without first requesting permission.
c. IN THAT the Defendant removed the Plaintiff's property even though it never commenced any legal action against her.
d. IN THAT the Defendant never advised Plaintiff, in writing, to remove her belongings from the cellar.
e. IN THAT the Defendant never requested her permission, CT Page 11348 in writing, to remove property.
f. IN THAT the Defendant never notified her, in writing, that they would remove property from the cellar.
g. IN THAT the Defendant locked the Plaintiff out of her cellar for a few weeks. Further, even after Judge Berger ordered the Defendant to allow Plaintiff access to her cellar, she was still locked out for three more days.
6. The value of the property removed by the defendant is $26,272.
7. The damages suffered by the Plaintiff as a result of the illegal entry and detainer are doubled, pursuant to C.G.S.47a-46.
8. Damages for emotional distress are awarded in the amount of $15,000.00.
9. Reasonable attorney's fees are awarded, pursuant to C.G.S. 42-110g(b) and will be determined at a post-trial hearing.
10. Plaintiff did not pay rent in the amount of $3,900.
IV. DISCUSSION
A. Liability
Defendant contests liability on two grounds. The first argument, raised obliquely, is that neither the bank's property manager, John Koseian, nor Larry Hughes, who actually removed the property, were acting at the behest of the bank. The second, more explicit argument, is that the defendant received permission from the plaintiff to remove the property, or at the least, was informed in advance of its removal.
With respect to the defendant's suggestion that it did not direct the removal of plaintiff's property, the uncontroverted evidence discloses that the bank hired John Koseian to manage the foreclosed property in which plaintiff rented an apartment. Having been informed by Koseian that the property in plaintiff's cellar needed to be removed the bank's vice president, a Mr. Marconi, personally hired Larry Hughes CT Page 11349 to perform the job. The bank paid Hughes directly.
Both Koseian and Hughes acted as agents of the defendant. Gordon v. Bridgeport Housing Authority, 208 Conn. 161 (1988). A principal is "bound by and liable for the acts which the agent does with or within the actual or apparent authority from the principal, and within the scope of the agent's employment." Newtown Associates v. Northeast Structures,15 Conn. App. 633, 637 (1988). Defendant is therefore liable for the acts of Koseian and Hughes.
Defendant's second argument is that the plaintiff gave permission to Koseian to remove the belongings, or at the very least, did not object when Mr. Koseian informed her of the bank's intent to remove the items. Not surprisingly, the testimony was widely divergent on this issue, with the plaintiff denying that either Koseian or any other representative of the bank discussed with her the bank's plans to remove the items from the cellar. The court finds that the plaintiff's testimony is fully credible on this issue, particularly in view of the fact that Hughes removed the belongings at 11:00 on a Saturday night and Koseian remains potentially liable to the defendant. See, Defendant's March 1, 1993 Motion to Implead Third Party Defendant, claiming that John Koseian "is or may be liable to said defendant for the Plaintiff's claim against them."
1. Entry and Detainer
As previously noted Judge Berger found that defendant violated General Statutes 47a-43 (2) and (3). This court concurs. The defendant, acting through its agents committed an entry and detainer in that "it enter[ed] into any land, tenement or dwelling unit and caused damage to the premises or damage to or removal of or detention of the personal property of the possessor." 47a-43 (3) (emphasis supplied). The evidence demonstrates that Mr. Hughes, acting on the instructions of the defendant, entered plaintiff's basement without her permission and removed her personal property. This constitutes an illegal entry and detainer. Communiter Break Co. v. Scinto, 196 Conn. 390 (1985). Judgment shall enter for the plaintiff as to the third count of her complaint.
2. Negligent Infliction of Emotional Distress CT Page 11350
Count Eight of Plaintiff's complaint alleges negligent infliction of emotional distress. In order to make out her claim, the plaintiff must demonstrate that the defendant "should have realized that its conduct involved an unreasonable risk of causing emotional distress." Montineri v. Southern New England Telephone", 175 Conn. 357 (1978). Plaintiff has unquestionably satisfied that test.
Neither Hughes, Koseian nor the bank provided advance written notice to the plaintiff of the cleanup of the basement. Had this simple precaution been taken, this entire matter would have been avoided. Mr. Koseian knew that the property in the basement had not been abandoned. Cummings v. Tripp, 204 Conn. 67 (1987). Further, his testimony that he only observed trash and debris in the basement is not believable. The plaintiff stored in plain view a dining room set, an electronic system, a brass bed and at least forty boxes. Finally, the removal of the plaintiff's property at 11:00 p.m. on a Saturday night and subsequent claim that obviously valuable property was taken to the dump raises serious questions as to whether the removal was more in the nature of a theft. Under all of these circumstances, the conduct of defendant and its agents caused an "unreasonable risk of emotional distress." Montineri v. Southern New England Telephone, supra.
Finally, there is no question that plaintiff has suffered and will continue to suffer emotional trauma as a result of defendant's negligence. The loss of her most cherished family possessions, dating to childhood, has understandably resulted in a severe emotional injury. The loss of faith in others, the disruption of relationships and the lack of hope for the future are the painful results of defendant's conduct, all proximately caused by defendant's negligence. Judgment shall enter for the plaintiff as to count eight of her complaint.
3. Unfair Trade Practice
The standards for establishing a violation of the Connecticut Unfair Trade Practices Act, General Statutes42-110a et seq. are well established.
 In determining whether a practice violates CUTPA, we use the following CT Page 11351 criteria: "`"(1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." FTC v. Sperry Hutchinson Co., 405 U.S. 233, 244-45 n. 8, 92 S.Ct. 898, (1972).
Daddona v. Liberty Mobile Home Sales, Inc., 209 Conn. 243, 254
(1988). (cites omitted).
A violation of the entry and detainer statute; General Statutes 47a-43a; may constitute a CUTPA violation. Daddona v. Liberty Mobile Home, Id., (dismantling and removing plaintiff's mobile home); Freeman v. Alamo Management,221 Conn. 674 (1992) (removal of occupant's personal property); Livingston v. Fenderson, 7 CSCR 675 (June 8, 1992); John Hay Benevolent Association v. William Gelinas, 5 CSCR 19 (January 8, 1990).
In this case plaintiff has satisfied all of the elements necessary to establish a CUTPA violation. "Trade" or "Commerce" as defined in CUTPA includes the rental or leasing of property. 42-110a(4). The plaintiff's right not to have her property removed except in accordance with a summary process action or other lawful means is a violation of public policy. Daddona v. Liberty Mobile Home, supra; as a result of which the plaintiff has suffered an "ascertainable loss." Id. Accordingly, judgment shall enter for the plaintiff as to count six of her complaint. However, because double damages — which are in the nature of punitive damages — are awarded as to the entry and detainer count, punitive damages are not awarded for the CUTPA violation. Freeman v. Alamo Managements, 221 Conn. 674 (1992). Plaintiff is awarded reasonable attorney's fees.
IV. DAMAGES CT Page 11352
The central dispute in this case concerns plaintiff's damages. Defendant argues that plaintiff's claim is inflated and that she has used the wrong measure in calculating her damages. The following additional facts are relevant to this issue.
Plaintiff's Exhibit A sets forth the items removed from her cellar and her estimate of either (1) the cost of the items at the time of purchase; (2) their estimated present cost; or (3) their present market value. The list contains hundreds of entries and was compiled over the course of a year based on plaintiff's recollection of the items stored in the basement. Plaintiff was assisted by her expert, a licensed appraiser who has assisted over one hundred persons who have also suffered catastrophic losses.
By category, the items on Plaintiff's Exhibit A consist of (1) furniture, housewares, appliances and baby items; (2) stereo equipment; (3) brass items; (4) women's clothing; (5) toys and games; (6) stuffed Animals and dolls; (7) winter clothing; (8) baby clothing; (9) girl's clothing; (10) boy's clothing; (11) liquor; and (12) Christmas and holiday items. According to plaintiff's expert persons who suffer major property losses typically do not remember 15-25% of the lost belongings.
Plaintiff's expert also testified that it is difficult to accurately establish a market value for many of an individual's personal items because of the absence of a willing seller and buyer. Because of these difficulties he believes that use of the cash value method of appraisal is the most accurate method for measuring plaintiff's loss. His conclusion is consistent with Supreme Court decisions on this subject.
 "The amount of recovery in the event of conversion ought not to be restricted to the price which could be realized by a sale in the market, but he should be allowed to recover the value to him based on his actual money loss, all the circumstances and conditions considered, resulting from his being deprived of the property, not including however, any sentimental or fanciful value he may for any reason place upon it.
CT Page 11353
Barker v. Lewis Storage and Transfer Co., 78 Conn. 198, 200
(1905).
In evaluating a plaintiff's claim for damages, "the amount of the loss [can] not be proven with exactitude and all that is required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate." Griffin v. Nationwide Moving Storage Co.,187 Conn. 405, 423 (1982).
In light of the foregoing the court concludes that with the exception of the brass items, for which there is a reasonably ascertainable market value, the plaintiff's estimate of her losses is fair and reasonable. Plaintiff will not be awarded damages for the value of the stereo system, however, as the court concludes it was owned by the plaintiff's then fiancee and not her. Accordingly, the court finds that the value of the property unlawfully removed from plaintiff's basement is $26,272. Damages are awarded as follows:
A. Count Three (Entry and Detainer) (Double Damages) $52,544.00
B. Count Six (CUTPA) No punitive damages awarded
C. Count Eight (Negligent Emotional Distress) $15,000.00
D. Set-Off (Unpaid Rent) (3,900)
 TOTAL ___________ $63,644.00
D. Attorneys Fees pursuant to CUTPA will be determined at a subsequent hearing.
Judgment for defendant on all other counts.
SO ORDERED.
Holzberg, J. CT Page 11354