[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
After trial the court finds as follows. Prior to March 31, 1992 Stan Manousos ("Manousos") and Edward Kennedy ("Kennedy") were part owners of a business known as Park, Ride Fly, Inc. which was the largest operator of valet parking lots servicing the Bradley International Airport (the "Airport") in Windsor Locks, Connecticut. Prior to March 31, 1992, Robert A. Gosselin ("Gosselin") or entities which he controlled were in the valet parking business near the Airport and owned and operated a 750 parking space valet parking lot, known as Airport Valet, at 53 Ella Grasso Turnpike in Windsor Locks. Park, Ride Fly, Inc. owned and operated an airport valet parking lot immediately across the street from Airport Valet. In late 1991 Manousos and Kennedy became interested in purchasing Airport Valet from Gosselin. Their interest in acquiring Airport Valet stemmed primarily from the favorable location of Airport Valet and their perception that Airport Valet's customers were primarily leisure travelers, unlike the customers of Park, Ride Fly, Inc., who were mainly business travelers. CT Page 10452
Manousos and Kennedy met several times with Gosselin concerning their purchase of the Airport Valet business. Gosselin wanted to sell the business for all cash, but Manousos and Kennedy did not have sufficient cash to purchase on that basis. Therefore, the parties agreed to enter into a lease with a purchase option under the terms of which Gosselin would lease the property to Manousos and Kennedy and they would operate the valet parking business thereon.
During the negotiations which led to the transfer of the business, Gosselin's chief concerns were that he retain the ability to take over the Airport Valet operation quickly in the event that Manousos and Kennedy failed to make the payments required under the lease and that he avoid becoming involved in the financial difficulties of Park, Ride Fly, Inc., Manousos and Kennedy. In order to satisfy the later concern, a new entity, the plaintiff, PRF of Connecticut, Inc. ("PRF"), was formed to enter into the lease-purchase option transaction. The shareholders and directors of PRF are the wives of Manousos and Kennedy. Manousos and Kennedy have controlled the operations of PRF and continue to do so.
Prior to the closing of the lease-purchase option transaction, Manousos, Kennedy and Gosselin discussed the subject of a non-compete agreement to be entered into incidental to that transaction. Manousos and Kennedy were concerned that Gosselin was an experienced valet parking operator and did not want Gosselin to start competing with therein the valet parking business at the same time they were making payments to Gosselin for the Airport Valet business. Gosselin did not intend to compete in the valet parking business, but rather, he intended to retire to Florida. Therefore, prior to the closing, the parties did not devote very much time to discussions or negotiations concerning that agreement.
At the closing of the lease-purchase option, which occurred on March 31, 1992, Helga Woods, the attorney who represented Manousos and Kennedy, presented Gosselin with a Non-Compete Agreement, which she had drafted prior to the closing. That document provided that Gosselin could provide parking and shuttle services to the patrons of the Bradley International Inn ("Bradley Inn") without violating the Non-Compete Agreement. Gosselin and his wife own the real estate on which the Bradley Inn is located and Gosselin is the sole shareholder in R.A. CT Page 10453 Gosselin Enterprises, Inc., which owns the Bradley Inn. At the closing, Gosselin requested only one amendment to the Non-Compete Agreement to permit him or an entity which he owned or controlled to bid on and/or manage parking lots located on Airport property. Manousos and Kennedy agreed to that amendment.
The pertinent portions of the Non-Compete Agreement executed at the closing are:
 Whereas, to induce PRF to enter into the Lease and the Option, Gosselin has agreed to execute and deliver this Non-Compete Agreement on the terms and conditions hereinafter set forth.
 Now Therefore, for and in consideration of the sum of One Dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Gosselin hereby agrees as follows:
 1. Gosselin will not, for a period of five (5) years from the date of this Non-Compete Agreement and within a five (5) mile radius of Bradley International Airport in Windsor Locks, Connecticut, compete in the operation on any commercial parking lot serving Bradley International Airport, either directly or indirectly, as an employee, partner, shareholder, director, consultant, agent, creditor, or otherwise, so long as PRF shall be conducting any such business thereon; provided, however, that nothing in this Non-Compete Agreement shall prevent the Gosselin Children from being employed by any competitor of PRF. During this period, Gosselin shall not employ or solicit for the purpose of employment any of the present employees of PRF for any purpose. Notwithstanding the foregoing, it shall not be a violation of this Non-Compete Agreement for Gosselin to provide parking and shuttle services to patrons of Bradley International Inn (the "Inn") only, so long as Gosselin, Robert A. Gosselin, Lorraine Gosselin and/or Lorraine Gosselin or any CT Page 10454 partnership or corporation of which Robert A. Gosselin and/or Lorraine Gosselin own a majority in interest, owns the Inn, or to bid on and/or manage any on-airport parking services.
 4. PRF shall be entitled to injunctive relief in the event that Gosselin or any of them may be violating or threatening to violate the provisions of this Non-Compete Agreement, legal remedies being inadequate to fully protect PRF, and in such event no sums otherwise due under the Lease shall be paid by PRF to the Owner.
 5. Gosselin shall pay all costs and expenses, including reasonable attorneys' fees, incurred by PRF in any action to enforce the provisions of this Non-Compete Agreement.
At the closing Gosselin's attorney requested the deletion of the liquidated damages provision set forth above in paragraph 4 of the Non-Compete Agreement. However, Manousos and Kennedy refused to consent to the deletion. Thereafter, Gosselin and his wife, Lorraine executed the Non-Compete Agreement and represented that their children would execute the Agreement and that Gosselin would return the executed Agreement to his attorney.
Several days after the closing, Gosselin asked his son, Kenneth Gosselin, to execute the Non-Compete Agreement. Instead of executing the Agreement as it existed at the closing, Kenneth altered it by crossing out the words "to patrons of" in the phrase, "it shall not be a violation of this Non-Compete Agreement for Gosselin to provide parking and shuttle services to patrons of Bradley International Inn", and adding the word "at" over the words which had been deleted, so that the foregoing phrase then read as follows: "it shall not be a violation of this Non-Compete Agreement for Gosselin to provide parking and shuttle services at Bradley International Inn."
Thereafter Mark Gosselin and Gerry Gosselin, the other children of Gosselin, executed the altered Agreement. Although Gosselin was aware of the alteration, he did not inform his attorney thereof when he returned the Non-Compete Agreement to her. She had no reason to suspect that her client had engaged in CT Page 10455 the highly irregular act of altering a document, which he had promised to have executed, and she forwarded the altered Non-Compete Agreement to Manousos' attorney without mentioning the alteration of which she was unaware. Manousos' attorney received the altered Agreement, but having no reason to suspect that the document had been altered, she did not notice the alteration and placed the document in the file with the other documents which had been executed at the closing.
In the fall of 1992 one of the plaintiff's customers at the old Airport Valet location presented a coupon bearing the name "Bradley International Inn". This alerted Manousos and Kennedy to the fact that Gosselin was competing with the plaintiff in the airport valet parking business, notwithstanding the Non-Compete Agreement. Thereafter, Manousos requested an executed copy of the Non-Compete Agreement from his attorney and learned for the first time that the language of the Non-Compete Agreement had been altered after the closing.
In December of 1992 PRF commenced this action in which it seeks an injunction to prohibit Gosselin from conducting valet parking in violation of the Non-Compete Agreement, liquidated damages, attorneys' fees and costs pursuant to that Agreement and damages under the Connecticut Unfair Trade Practices Act, Connecticut General Statutes 42-110 et seq.
The principal dispute between the parties centers on the interpretation and validity of the Non-Compete Agreement executed on March 31, 1992. Paragraph 1 of the Non-Compete contains the essential terms of the Agreement and a carve-out allowing the defendants to provide valet parking services for "patrons" of the Bradley Inn and also allows the defendants to bid for contracts which would provide on-site airport parking services at the Airport.
Gosselin argues that the phrase "patrons of the Bradley International Inn", contained in the original Non-Compete Agreement, means all customers of the Bradley Inn and, therefore, he is not violating the terms of the Non-Compete Agreement by conducting airport valet parking at the Bradley Inn. However, Gosselin's conduct with respect to that phrase demonstrated that he knew that the Agreement's use of the word "patrons" was meant to restrict valet parking at the Bradley Inn. Gosselin allowed his son, Kenneth to alter the Non-Compete Agreement to remove the word patrons and did not even notify his own attorney of the CT Page 10456 alteration when he returned the document to her.
The court finds that the use of the word patrons was intended by all parties to refer to people who were overnight guests at the Bradley Inn. Manousos and Kennedy allowed the carve out provision because Gosselin told them that he had been providing valet parking services to overnight guests at the Inn for many years. They did not see such valet parking as posing any competitive threat to their business because it was only parking incidental to the lodging of overnight guests.
Gosselin also argues that the anti-competitive covenant in the non-compete agreement is not enforceable because it is an unreasonable restraint of trade. An anti-competitive covenant ancillary to a lawful contract is enforceable if the restraint upon trade is reasonable. Elida, Inc. v. Harmor Realty Corporation, 177 Conn. 218, 225, 413 A.2d 1226 (1979). The "test of its validity is the reasonableness of the restraint it imposes. To meet this test successfully, the restraint must be limited in its operation with respect to time and place and afford no more than fair and just protection of the party in whose favor it is to operate, without unduly interfering with the public interest." Id at 226; Mattis v. Lally, 138 Conn. 51, 54,82 A.2d 155 (1951); Lampson Lumber Co. v. Caporale, 140 Conn. 679,683, 102 A.2d 875 (1954).
In Scott v. General Iron Welding Co., 171 Conn. 132, 137,368 A.2d 111 (1976) the Connecticut Supreme Court enumerated five criteria by which to determine the reasonableness of a restrictive covenant in an employment contract: (1) the length of time the restriction is to be in effect; (2) the geographic area covered by the restriction; (3) the degree of protection afforded to the party in whose favor the covenant is made; (4) the restrictions on the employee's ability to pursue his occupation; and (5) the extent of interference with the public's interests. Although this case does not involve a covenant between an employer and employee, those criteria provide a useful framework for evaluating the reasonableness of the restrictive covenant at issue here.
Paragraph 1 of the Non-Compete Agreement provides: "Gosselin will not, for a period of five (5) years from the date of this Non-Compete Agreement and within a five (5) mile radius of Bradley International Airport in Windsor Locks, Connecticut, compete in the operation of any commercial parking lot serving CT Page 10457 Bradley International Airport. . ." The reasonableness of the foregoing restrictions must be evaluated in light of all of the circumstances. Robert S. Weiss and Assoc., Inc. v. Wiederlight,208 Conn. 525, 529, 546 A.2d 216 (1988). The geographic limitation here is limited to a five mile radius of the Airport because a valet parking business operated outside of that area could not effectively service customers who were using the Airport and would, therefore, not pose a competitive threat to the business of the plaintiff. The restrictions do not unduly interfere with the public interest. There are eight or more valet parking businesses servicing the Airport. The prohibition against Gosselin competing with the plaintiff as an additional valet parking provider can hardly be said to restrict the public's right to a free and open marketplace nor to restrict the public's freedom to choose with whom they will transact business. New Haven Tobacco Co. v. Perrelli, 11 Conn. App. 636, 639,528 A.2d 865 (1987).
Gosselin argues that there is no evidence that the five year duration of the restrictive covenant bears any reasonable relationship to the time necessary for PRF to have developed a relationship with customers. Thus, the time restriction is longer than necessary for the purpose of the non-compete. Such an argument might be more persuasive if this case required the court to balance the interest of an employee in earning a living with the business interests of his former employer. It does not.
The time restriction must be evaluated in light of the following circumstances. Gosselin clearly expressed his intent to retire to Florida and refrain from engaging in the valet parking business. Manousos and Kennedy knew that the lease obligated them to make a non-refundable security deposit to Gosselin's corporation, Fifty-Three Turnpike Road Associates, in the amount of $250,000 and to pay rent in the amount of $35,000 per month for a term of seven years. They also knew that Gosselin was an experienced valet parking operator and did not want him to compete with them during the first five of the seven years in which they were obligated to pay him the amount of $420,000 per year. Manousos and Kennedy would not have agreed to pay the foregoing amounts absent the restrictive covenant. Under these circumstances the five year time restriction is not unreasonable.
Where a covenant not to compete is between a vendor and a vendee of a business, as in this case, it is viewed with greater CT Page 10458 indulgence than is a restrictive covenant between and employer and an employee. This is so because restrictive covenants add to the value of the business leased or sold and add to the value of the business leased or purchased. In such cases, all parties are in equal bargaining positions with respect to negotiations of the restrictive covenants, and, therefore, "a large scope for freedom of contract and a correspondingly large restraint of trade" is allowable. Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 253,108 A. 541 (1919). In this case the parties were in equal bargaining positions and represented by experienced attorneys when they entered into the Non-Compete Agreement.
Even in cases where the seller will experience significant hardship from the enforcement of a restrictive covenant, the court will enforce the covenant if it has resulted from the sale and purchase of a business for the which the buyer has paid substantial consideration. Mattis v. Lally, supra, at 56.
A party seeking injunctive relief has the burden of alleging and proving irreparable injury and lack of adequate remedy at law. Berlin v. Olson, 183 Conn. 337, 340, 439 A.2d 357 (1981); Hartford v. American Arbitration Association, 174 Conn. 472, 476,391 A.2d 137 (1978). However, irreparable injury has been held to be the inevitable result of the breach of a restrictive covenant. In Welles v. O'Connell, 23 Conn. Sup. 335, 337 (1962) the court stated that where a party has engaged in "a breach of a restrictive covenant there can be no question that the plaintiff is entitled to an injunction restraining the breach, irrespective of whether the damage he will suffer is great or small." (quoting Lampson Lumber Co. v. Caporale, 140 Conn. 679, 685, 102 A.2d 875
(1954).
In Gartner Group, Inc. v. Mewes, 7 C.S.C.R. 275 (Jan. 3, 1992, Mottolese, J.) this court considered the requirement of proving irreparable harm in an action to enjoin the breach of a covenant not to compete in an employment contract:
 While ordinarily proof of imminent harm is essential, in this type of case there is no such requirement. It has long been recognized in this state that a restrictive covenant is a valuable business asset which is entitled to protection. Torrington Creamery, Inc. v. Davenport, [126 Conn. 516] at 521. Irreparable harm would invariably result from a violation CT Page 10459 of the defendant's promises. Mattis v. Lally, 138 Conn. 51, 56; Welles v. O'Connell, 23 Conn. Sup. 335, 337. The reason for this is that such a plaintiff's actual injury is not susceptible of determination to its entire extent but is estimable largely by conjecture and prediction. Case v. Zeiff, 10 Conn. Sup. 530, 532.
. . .
 [W]hile the plaintiff could maintain a claim for damages as to each violation that causes injury the difficulty of proof and the inefficiency of repetitive suits render inadequate the use of successive remedies at law, and injunctive relief is therefore warranted to protect the plaintiff from harm which the restrictive covenant was intended to prevent.
The Non-Compete Agreement provides: "PRF shall be entitled to injunctive relief in the event that Gosselin or any of them may be violating or threatening to violate the provisions of this Non-Compete Agreement." PRF's damages from the violation of the restrictive covenant are not susceptible of precise determination, yet PRF entered into the transaction with Gosselin and agreed to pay substantial consideration based, in part, on the presence of the covenant. PRF would not have entered into the transaction absent the covenant not to compete. Therefore, the violation of the covenant will result in irreparable injury to PRF and an injunction may issue in accordance with the terms set forth below.
PRF also seeks to recover liquidated damages under paragraph 4 of the Non-Compete Agreement, which provides that if Gosselin, his wife or children or Fifty-Three Turnpike Road Associates violates the restrictive covenant, "no sums otherwise due under the Lease shall be paid by PRF to the Owner."
It is well settled that a contract provision which imposes a penalty for breach of contract is invalid, but a provision which allows liquidated damages for breach of contract is enforceable if certain conditions are satisfied. Norwalk Door Closer Co. v. Eagle Lock Screw Co., 153 Conn. 681, 685, 220 A.2d 263 (1966); CT Page 10460 Hanson Development Co. v. East Great Plains Shopping Center, Inc., 195 Conn. 60, 64, 485 A.2d 1296 (1985). The requisite three conditions are that: (1) the damage which was to be expected as result of a breach of contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable. Berger v. Shanahan, 142 Conn. 726,732, 118 A.2d 311 (1955); Hanson Development Co. v. East Great Plains Shopping Center, Inc., supra.
The damages to be expected from the breach of the restrictive covenant were uncertain in amount and difficult to prove and the parties intended to liquidate damages in advance. However, the amount stipulated was not reasonable.
Enforcement of the liquidated damages clause would result in a complete forfeiture of all amounts received by Gosselin under the lease. Furthermore, the liquidated damages amount does not correspond to any reasonably anticipated diminution in the income of PRF as a result of the violation of the restrictive covenant. Manousos and Kennedy entered into the lease-purchase option agreement with Gosselin based on his verbal representation that the Airport Valet business produced approximately one million dollars a year in gross revenues. At trial Manousos testified that he found the revenues from the business to be slightly less than that amount after he and Kennedy took over its operation. He presented no income tax returns, receipts journals or any other documentation to show any decline in the revenues of that business which resulted from a violation of the restrictive covenant. He admitted that the preexisting valet parking businesses of Park, Ride, Fly, Inc. were combined with the former Airport Valet business after PRF entered into the lease with Fifty-Three Turnpike Road Associates. This made it even more difficult to compare the income of the Airport Valet business before and after its operation by Manousos and Kennedy.
PRF has failed to prove that it sustained any actual damages as a result of the violation of the restrictive covenant. A provision in a contract for the payment of a fixed sum as damages, whether stipulated for as a penalty or as liquidated damages, will not be enforced in a case where the court sees that no damage has been sustained. Norwalk Door Closer Co. v. Eagle Lock Screw Co., supra, at p. 688.
After Manousos and Kennedy took over operation of the valet CT Page 10461 parking lot in question, they continued to receive amounts substantially in excess of the lease payments they made to Fifty-Three Turnpike Road Associates. Thus, the enforcement of the liquidated damages clause would result in a windfall to PRF and a complete forfeiture by Gosselin. For the foregoing reasons the amount of the liquidated damages in the Non-Compete Agreement is unreasonable and that portion of the Agreement is unenforceable.
Enforcement of the injunctive relief portion of the Non-Compete Agreement in the manner set forth below is sufficient to protect the interests of PRF.
The Second Count of the complaint alleges a violation of the Connecticut Unfair Trade Practices Act ("CUTPA,), 42-110a et seq. of the Connecticut General Statutes based on the Gosselin's deceptive and unethical conduct in executing an Agreement not to compete and blatantly violating that Agreement by directly competing with the Plaintiff's business.
In determining whether an act or practice is unfair and violative of CUTPA, the court must determine whether the practice 1) offends public policy as it has been established by statutes or the common law or some established standard of legality; 2) whether it is unethical, immoral oppressive or unscrupulous, or 3) whether it causes substantial injury to consumers. Cheshire Mortgage Service, Inc. v. Monks, 223 Conn. 80, 105-106,612 A.2d 1130 (1992); Conaway v. Prestia, 191 Conn. 484, 492-493,464 A.2d 847 (1983) (quoting FTC v. Sperry Hutchinson Co., 405 U.S. 233,244-45 n. 5 (1972). A violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. Daddona v. Liberty Mobile Home Sales, Inc., 209 Conn. 243, 550 A.2d 1061 (1988). Gosselin's violation of the restrictive covenant was blatant, but it was not deceptive and, it did not violate public policy. Moreover, a single instance of unfair practices will not support an action under CUTPA. Koehm v. Kuhn, 41 Conn. Sup. 130, aff'd,18 Conn. App. 313 (1987).
PRF is awarded attorneys' fees in accordance with the Non-Compete Agreement in an amount to be determined after a hearing and should recover costs in accordance with the terms of the agreement. In accordance with the foregoing it is hereby ORDERED:
1. Robert A. Gosselin is permanently enjoined from directly and/or indirectly, as an employee, partner, shareholder, CT Page 10462 director, consultant, agent, creditor or otherwise, providing commercial parking serving Bradley International Airport within a five mile radius of the Airport, including the location at the Bradley International Inn until April 1, 1997;
2. Any airport valet parking which occurs at the Bradley International Inn will constitute a violation of this injunction if it is provided to customers other than registered overnight guests of the Inn.
By the Court
Aurigemma, J.