SECOND DIVISION
 November 27, 1996
 

Nos. 1-95-3792 and 1-95-4114, consolidated

PHYLLIS J. WEATHERMAN, RUTH A. RUSSELL, ) Appeal from the
and ROLAND D. VEGA, ) Circuit Court of
 ) Cook County.
 Plaintiffs-Appellees and Cross- )
 Appellants, ) 
 )
 )
 v. ) 94 CH 00593
 )
 ) 
GARY-WHEATON BANK OF FOX VALLEY, N.A., )
now known as THE FIRST NATIONAL BANK OF ) 
CHICAGO, N.A., and FIRST CHICAGO ) 
CORPORATION, ) 
 ) 
 Defendants-Appellants and Cross- )
 Appellees. ) The Honorable
 ) Edwin Berman,
 ) Judge Presiding.

 JUSTICE SCARIANO delivered the opinion of the court:
 In this appeal, we must determine whether, under the circum-
stances present in this case, the defendants' assessment of fees
against plaintiffs for recording the assignment of a mortgage and
for the suspension of an escrow violated the Illinois Consumer
Fraud and Deceptive Practices Act. For the reasons that follow, we
conclude that the assessment for recording the assignment of the
mortgage violated that Act, while the charging of a fee for 
suspending the escrow payments was not a violation thereof.
 Plaintiffs Phyllis J. Weatherman, Ruth A. Russell, and Roland
D. Vega obtained a residential mortgage from Gary-Wheaton Bank of
Fox Valley (Gary-Wheaton). After plaintiffs applied for their
loan, the First National Bank of Chicago (First National), which is
a subsidiary of First Chicago Corporation (First Chicago), acquired
Gary-Wheaton. Plaintiffs filed a class-action complaint against
First National and First Chicago, in which they alleged that these
defendants had violated the Illinois Consumer Fraud and Deceptive
Practices Act (Consumer Fraud Act; sometimes, Act) (815 ILCS 505/1
et seq. (West 1992)) by charging them a mortgage assignment
recording fee and an escrow suspension fee at closing.
 Defendants filed a motion to dismiss pursuant to section 2-
619.1 of the Illinois Code of Civil Procedure (735 ILCS 5/2-619.1
(West 1992)). The circuit court dismissed First Chicago from the
case and it also dismissed that portion of the complaint concerning
the escrow suspension fee, but it denied the motion with respect to
the claim relating to the mortgage assignment recording fee. First
National then filed a motion under section 2-619 of the Code of
Civil Procedure (735 ILCS 5/2-619 (West 1992)) to dismiss the
mortgage assignment recording fee claim. The court also denied
this motion.
 At First National's request, the circuit court then certified
to this court the following question under Supreme Court Rule 308
(134 Ill. 2d R. 308):
 "A. Whether a lender violates the Illinois Consumer
 Fraud and Deceptive Practices Act by giving an applicant
 for a loan, at the time a loan is applied for, a gross
 estimate of the recording fees to be paid at closing and
 not telling the loan applicant until closing that one of
 the fees included in the gross estimate was a fee to
 cover the cost of recording the assignment of the
 mortgage securing the loan.
 B. In this case, the assignee of the assignment is
 a wholly-owned affiliate of the defendant."
The circuit court also found, under Supreme Court Rule 304(a) (134
Ill. 2d R. 304(a)), that there was no just reason to delay the
appeal of its decision on the escrow suspension fee. It stayed
further proceedings pending this court's decision on the certified
question. We granted the appeal on the certified question and
consolidated it with the plaintiffs' appeal under Rule 304(a).
 In the appeal under Rule 308, First National argues that a
mortgage assignment recording fee is proper under the circumstances
stated in the certified question because (1) the Real Estate
Settlement Procedures Act (27 U.S.C.A. 2601 et seq. (West 1989))
provides a defense to a lender's liability under the Consumer Fraud
Act; (2) it is not an unfair or deceptive practice under the
Consumer Fraud Act for a lender to charge a borrower a mortgage
assignment recording fee; (3) section 1735f-7a(1) of the Depository
Institutions Deregulation and Monetary Control Act of 1980 (12
U.S.C.A. 1735f-7a(1) (West 1989)) preempts the Consumer Fraud Act;
and (4) the Illinois Interest Act (815 ILCS 205/1 et seq. (West
1992)) rather than the Consumer Fraud Act governs a lender's right
to charge a borrower a mortgage assignment recording fee. In their
appeal under Rule 304(a), plaintiffs argue that the circuit court
erred in dismissing their claim relating to the escrow suspension
fee because this fee violated the Consumer Fraud Act and because
the court erroneously concluded that waiver and voluntary payment
barred their action.
 In their class-action complaint against First National and
First Chicago, plaintiffs alleged that they applied to Gary-Wheaton
for a mortgage to refinance their residential property. Plaintiffs
signed a loan commitment and gave Gary-Wheaton approximately $1,400
as a "lock-in fee," which was refundable if they closed on the
loan. At some time prior to closing, Gary-Wheaton chose to assign
plaintiffs' mortgage to Midwest Mortgages, Inc. (Midwest). Gary-
Wheaton did not inform plaintiffs until closing that they would be
required to pay a $15 fee for recording the assignment to Midwest. 
Midwest was an affiliate of First Chicago at the time Gary-Wheaton
made the loan to plaintiffs.
 Plaintiffs further alleged that Gary-Wheaton advised them that
it would temporarily "suspend the escrow." "At a later date and
after the loan had been approved, approximately three or four days
before the January 12, 1993 closing," Gary-Wheaton demanded that
plaintiffs pay a fee of $343.13 to "control their own escrow." 
Plaintiffs alleged that Gary-Wheaton told them that it would not
complete the loan transaction if plaintiffs did not pay this fee. 
At closing, plaintiffs sent a letter to Gary-Wheaton, in which they
disputed the escrow suspension fee and the mortgage assignment
recording fee. They paid these fees, however, to avoid losing
their lock-in fee.
 Plaintiffs maintain that they received no benefit from the
escrow suspension fee or the mortgage assignment recording fee. In
addition, they alleged that if they had known before paying their
lock-in fee that Gary-Wheaton would charge them these two fees,
they "would have pursued refinancing with other lenders who did not
require payment of these fees"; that Gary-Wheaton intended plain-
tiffs to rely on its omissions and misrepresentations, and that
plaintiffs did rely on its omissions and misrepresentations. 
 Based on these allegations, plaintiffs claimed that First
National and First Chicago had engaged in unauthorized and
deceptive lending practices. They asserted that it was a violation
of the Consumer Fraud Act to charge the mortgage assignment
recording fee because the assignment was separate from the loan
transaction. They asserted that it was a violation of the Act to
charge the escrow suspension fee because Gary-Wheaton had waived
its right to require an escrow. They also asserted that the timing
of the disclosure of the fees violated the Act, and that Gary-
Wheaton misrepresented that the fees were required charges and were
necessary for it to close and fund the loan.
 Plaintiffs attached several documents to their complaint. One
of these was the "Good Faith Estimate of Charges" that Gary-Wheaton
provided them at the time they applied for the loan. This good
faith estimate consisted of a pre-printed list of fees with boxes
next to the listed items, in which an estimated amount could be
written. In the box on the line for "recording fees," the amount
$80 was written. In spaces provided for "others," there was an
estimate of $180 for nine months of insurance escrow and $333 for
eight months of tax escrow, although at some point, someone drew a
line through the tax escrow estimate and initialled the change. At
the bottom of the form, there was a printed disclaimer. Because of
the poor quality of the copy in the record, only the words "you may
be required to pay other additional amounts at settlement" are
legible. The form was dated October 31, 1992, and signed by all
three plaintiffs. 
 Plaintiffs also attached a document entitled "Initial Escrow
Account Statement required by Section 10(c)(1) of the Real Estate
Settlement Procedure Act (RESPA)." This document listed plain-
tiffs' names and stated that the terms of their loan required them
to have an escrow account for taxes and insurance. Typed on the
printed form, however, are the words "temporary suspension of
escrows has been approved." The form is undated. 
 Another attachment was a copy of a loan disbursement state-
ment, which showed a "temporary suspension of escrow fee" of .25%
of the loan amount, or $343.13. Plaintiffs signed this statement,
which is also undated. 
 A fourth document plaintiffs attached was a HUD-1 form, which
listed plaintiffs' settlement costs at closing. This form, dated
January 12, 1993, the date of closing, listed the $343.13 fee as a
"temporary suspension of escrows." Recording fees were listed in
pre-printed categories as follows: $30 for the deed, $17 for the
mortgage, and $15 for releases. On a blank line below these
recording fees the words, "assignment of mortgage," were typed next
to the amount of $15. The last attachment to the complaint was the
letter, dated January 12, 1993, in which plaintiffs disputed the
fees.
 Defendants filed a motion to dismiss "pursuant to 735 ILCS
5/2-619.1, for failure to state a claim upon which relief may be
granted." To their motion to dismiss, they attached a copy of the
Illinois Mortgage Escrow Account Act (765 ILCS 910/1 et seq. (West
1992)) (Escrow Act) that plaintiffs had signed on January 12, 1993.
 In March 1994, the circuit court dismissed First Chicago
without prejudice, and, thereafter, First National filed a memoran-
dum to support its motion to dismiss. Among the attachments to the
memorandum was a document, entitled "Important Information for
Borrowers," which informed borrowers that their loan would "be sold
and transferred at or after closing." Plaintiffs signed this
document on October 31, 1992.
 First National attached plaintiffs' responses to requests to
admit to its reply to plaintiffs' response to its motion to
dismiss. In these responses, plaintiffs admitted that they had
asked Gary-Wheaton to suspend the escrow requirement after they
applied for the loan and after they had paid the lock-in fee. They
also admitted that Gary-Wheaton had refunded their $275 mortgage
application fee, but they asserted that this was because of errors
in the closing documents.
 On September 1, 1994, the circuit court denied the motion to
dismiss with respect to the mortgage assignment recording fee but
granted it with respect to the escrow suspension fee. The court
granted the motion with respect to the escrow suspension fee
because it concluded that plaintiffs had received advance notice of
the charge and had agreed to it in advance. The court did not
specify under which Code section it decided First National's
motion.
 One month after the court denied its motion to dismiss with
respect to the $15 mortgage assignment recording fee, First
National filed another motion to dismiss plaintiffs' claim with
respect to this fee. First National specified that this second
motion to dismiss was pursuant to section 2-619.
 In connection with its second motion to dismiss, First
National filed the affidavit of Leonard Giblin, president of
Midwest. In his affidavit, Giblin asserted that Midwest bought
"mortgages from lenders and [sold] them in the secondary mortgage
market, predominantly to such quasi-governmental agencies as the
Federal National Mortgage Association (Fannie Mae) and the Federal
Home Loan Home Mortgage Corporation (Freddie Mac)." Due to the
volume of mortgages it sold in the secondary market, Midwest was
able to get "better prices from Fannie Mae and Freddie Mac for its
mortgages than smaller-volume mortgage sellers.
 Giblin's affidavit also states that as a result of an
agreement under which Midwest promised to purchase mortgage loans
from Gary-Wheaton, the bank was able to offer home mortgage loans
with an annual percentage rate .05% lower than it would otherwise
have been able to offer. Giblin went on to state that "The $15
mortgage assignment fee charged to mortgagors to assign their
mortgages from Gary-Wheaton to [Midwest] is paid directly to the
title company which closes the mortgage loan and not to Midwest or
Gary-Wheaton."
 Plaintiffs attached Giblin's deposition to their surreply. He
testified therein that a bank that sells a mortgage to Midwest
bears the cost of the "mortgage assignment recording fee, which the
bank may collect at closing even though it assigns the mortgage
after closing. And then how they pay for it is not part of your
deal with them," acknowledging that the lender instructs the
closing agent to "charge the borrower or charge us or charge
whoever will pay it, because those instruction do come from the
lender." Giblin further deposed that Midwest prepared the bank's
preliminary truth in lending statement "where we estimated the
recording costs large enough to include the assignment." Midwest
acted as a broker, did not have assets to invest in mortgages, and
always bought mortgages for an investor. 
 On July 13, 1995, the circuit court denied First National's
second motion to dismiss, and it refused plaintiffs' request to
decide the issue of class certification at that time. As previous-
ly stated, the circuit court then certified a question under Rule
308 concerning the mortgage assignment recording fee and found,
pursuant to Rule 304(a), that there was no just reason to delay an
appeal involving its dismissal of plaintiffs' claim concerning the
escrow suspension fee. 
 As a preliminary matter, we deny plaintiffs' request that we
strike portions of First National's brief because First National's
arguments go beyond the certified question. Although it is true
that an appellate court should not expand on a certified question
to answer questions that could have been included but were not
(McCarthy v. La Salle National Bank and Trust Co., 230 Ill. App. 3d
628, 631, 595 N.E.2d 149 (1992)), it may answer questions that are
necessarily a part of the certified question (see Gordon v. Boden,
224 Ill. App. 3d 195, 198-99, 586 N.E.2d 461 (1991)). We find that
First National's arguments concerning federal law and the Illinois
Interest Act are relevant to the application of the Consumer Fraud
Act and are, therefore, relevant to the certified question.
 First National argues that charging a mortgage assignment
recording fee under the circumstances in the certified question
does not violate the Consumer Fraud Act because the fee is
disclosed in compliance with the Real Estate Settlement Procedures
Act (RESPA) (27 U.S.C.A. 2601 et seq. (West 1989)). First
National relies on section 10(b)(1) of the Consumer Fraud Act,
which provides:
 "Nothing in this Act shall apply to:
 (1) Actions or transactions specifically authorized
 by laws administered by any regulatory body or officer
 acting under statutory authority of this State or the
 United States." 815 ILCS 505/10(b)(1)(West 1992).
According to First National, providing a loan applicant with a
gross estimate of recording fees is in accordance with RESPA, which
does not require a lender, at the time of a loan application, to
itemize recording fees. Instead, the sample good faith estimate
form provided in RESPA regulations "requir[es] all recording fees
to be lumped together." 
 Yet, the stated purpose of RESPA is to provide "more effective
advance disclosure to home buyers and sellers of settlement costs." 
12 U.S.C.A. 2601 (West 1989). (Emphasis added.) To effectuate
this goal, RESPA provides that the Secretary of Housing and Urban
Development "shall develop and prescribe a standard form for the
statement of settlement costs which shall be used *** as the
standard real estate settlement form in all transactions in the
United States which involve federally related mortgage loans." 12
U.S.C.A. 2603(a)(West 1989). This statement is called a HUD-1 or
HUD-1A settlement statement. 24 C.F.R. 3500.2 (1996). 
 In this connection, section 5 of RESPA requires lenders to
provide borrowers with a good faith estimate of the amount of
settlement charges a borrower is likely to incur. 12 U.S.C.A.
2604(a),(c) (West 1989). We fail to discern any demonstration of
good faith on the part of a lender, who, well in advance of
closing, intends to assign plaintiffs' mortgage to its affiliate,
created for that very purpose, and chooses not, in the language of
RESPA, to provide "more effective advance disclosure to home buyers
and sellers of settlement costs" until the parties come together at
the closing of the transaction. (Emphasis added.) We take
"settlement costs" to mean all such costs without the convenience
to the lender of amorphously lumping together costs that occur to
the two parties to the loan and those relating only to the lender
and a third party. We note that Mr. Giblin, the principal owner
and president of the assignee, Midwest, deposed that Midwest
typically prepared the bank's truth-in-lending statements,
including the one in this case, in which "we estimated the
recording costs large enough to include the assignment." It is not
difficult to assess the value of such a stratagem: If disclosure
of an alien cost is not required for any reason at all, why
disclose it at all, and then why at the 11th hour when the parties
are in the midst of closing? Would that be a propitious time to
let a $15 difference "blow" a six figure transaction that took
time, effort and expense to put together? Plaintiffs contention
that they would have lost their "lock-in" fee in such an event
remains unchallenged in this proceeding.
 RESPA further authorizes the Secretary to prescribe rules and
regulations to achieve the purposes of the Act. 12 U.S.C.A. 2617
(West 1989). In one of these regulations, the Secretary explains
that the good faith estimate of charges the lender must provide
should contain a good faith estimate of the amount of "each charge"
which will be listed as a settlement charge on the HUD-1 form, and
if there are other charges that are not listed on this form but
which the borrower would pay at or before settlement based upon
common practice in the locality of the mortgaged property, these
should also be estimated at the time of the loan application. 24
C.F.R. 3500.7(c)(1996). The HUD-1 form, which is contained in
Appendix A of the regulations, has a line for recording charges,
and the instructions to the form tell the preparer of this form to
itemize recording fees. 24 C.F.R. Pt. 3500, App. A (1996).
 Appendix C of the RESPA regulations contains a suggested good
faith estimate form, which the regulations state is in compliance
with RESPA. 24 C.F.R. 3500.7(d)(1996). This form contains one
space for recording fees and has a space at the bottom to list
"other" fees. 24 C.F.R. Pt. 3500, App. C. (1996). At the top of
the form is the following disclaimer: 
 "The information provided below reflects estimates of the
 charges which you are likely to incur at the settlement
 of your loan. The fees listed are estimates -- the
 actual charges may be more or less. ***
 *** The HUD-1 or HUD-1A settlement statement will
 show you the actual cost for items paid at settlement." 
 24 C.F.R. Pt. 3500, App. C. (1996).
The regulations permit the lender to include additional information
in the good faith estimate as long as the form remains clear and
concise, and the additional information is not more prominent than
the required information. 24 C.F.R. 3500.7(d)(1996).
 We conclude that, based upon the regulations and the circum-
stances of this case, RESPA does not authorize a lender to give a
gross estimate for recording fees without itemization. To begin
with, the element of good faith, as we have already noted, is
totally lacking on the part of defendants. In addition, the
Secretary's regulations, 24 C.F.R. sec. 3500.7(c)(1996), as noted
above, require that if there are other charges that are not listed
on the HUD-1 form but which the borrower would pay at or before
settlement based upon common practice in the locality of the
mortgaged property, these should also be estimated at the time of
the loan application. 24 C.F.R. sec. 3500.7 (c)(1996). Here, Mr.
Giblin, president of Midwest, deposed, as previously indicated,
that a bank that sells a mortgage to Midwest bears the cost of the
mortgage assignment recording fee. This evidence not only
testifies to the local practice, but it would appear also to be
unassailably logical inasmuch as the assignment of a mortgage is a
transaction as to which the borrower is completely passive, indeed
a stranger. Accordingly, the disputed fee, being one that the
borrower would not pay at or before settlement based upon common
practice in the locality of the mortgaged property, is one that
cannot be included in the estimate.
 Moreover, we fail to be persuaded by the argument that by
limiting the information which a lender may include in the good
faith estimate, the regulations express a concern that the good
faith estimate remain clear and concise. Our review of the
regulations invoked by the defendants leads irresistibly to the
conclusion that, on the contrary, clarity and conciseness are
promoted by detailing, rather than withholding, the information
borrowers need in order to understand precisely what they are being
charged for. 
 It is noteworthy that although plaintiffs here were informed
more than two months before closing that their loan would "be sold
and transferred at or after closing," they were not informed that
the cost of recording that transfer would be charged to them. 
Moreover, as we have indicated above, recording fees were listed in
the HUD-1 form in pre-printed categories as $30 for the deed, $17
for the mortgage, and $15 for releases. Yet, on a blank line
provided immediately below these recording fees, the words
"assignment of mortgage" were typed next to the amount of $15,
further evidence that the fee for recording an assignment of a
mortgage is not one that a borrower would pay at or before closing
based upon common practice in the locality of the mortgaged
property, or the nature of the charge would be printed as were the
other recording fees traditionally borne by the borrower. 
Furthermore, Giblin's testimony that the borrower or the lender "or
whoever will pay it" is charged the assignment recording fee
attests to the fact that charging the borrower is not the "common
practice in the locaility of the mortgaged property." Indeed, the
only reference he makes to custom is that the lender pays the fee.
 What defendants opt for merely facilitates the lender's
passing on to their clients those charges that are, according to
Giblin's testimony, customarily those of the lender, a most
disingenuous contrivance to saddle a consumer with costs for a
transaction totally foreign to him, and one of which he would have
no formal knowledge except to be notified of the assignment after
closing, and which does not educate him in any way as to the
recording thereof and who pays for it. And even then such formal
notice would be solely for the purpose of ensuring that the
borrower makes his mortgage payments to the proper holder of the
mortgage obligation.
 Given that RESPA does not authorize, under the facts in this
case, a gross estimate of recording fees, it fails to constitute a
defense to liability under section 10(b) of the Consumer Fraud
Act. Analogous cases under the Federal Truth in Lending Act (15
U.S.C. 1601-65 (1982)) which support a finding that RESPA compli-
ance is a defense to liability under the Consumer Fraud Act are
therefore inapposite here. 

 Section 2 of the Consumer Fraud Act provides,
 "Unfair methods of competition and unfair or decep-
 tive acts or practices, including but not limited to the
 use or employment of any deception, fraud, false pre-
 tense, false promise, misrepresentation or the conceal-
 ment, suppression or omission of any material fact, with
 intent that others rely upon the concealment, suppression
 or omission of such material fact, or the use or employ-
 ment of any practice described in Section 2 of the
 'Uniform Deceptive Trade Practices Act', *** in the
 conduct of any trade or commerce are hereby declared
 unlawful whether any person has in fact been misled,
 deceived or damaged thereby." 815 ILCS 505/2 (West
 1992).
To establish a deceptive practice claim under the Consumer Fraud
Act, a plaintiff must allege (1) the misrepresentation or conceal-
ment of a material fact, (2) the defendant's intent that the
plaintiff rely on the misrepresentation or concealment, and (3) the
occurrence of the deception in the course of trade or commerce. 
Dwyer v. American Express, 273 Ill. App. 3d 742, 749, 652 N.E.2d
1351 (1995).
 First National contends that there was no misrepresentation in
connection with the fee, and no statute or regulation prohibited it
from charging the fee. Plaintiffs assert that it was unfair and
deceptive for Gary-Wheaton to "spring" an unpermitted fee at
closing as a requirement for closing and to force plaintiffs to
either pay this fee or lose thousands of dollars.
 We cannot agree with First National that the circumstances
stated in the certified question show no misrepresentation or that
they do not demonstrate concealment of a material fact. To show
concealment of a material fact under the Consumer Fraud Act, a
plaintiff must prove that the defendant stayed silent in circum-
stances under which it had a duty to speak. Mackinac v. Arcadia
National Life Ins. Co., 271 Ill. App. 3d 138, 143, 648 N.E.2d 237
(1995). We have already indicated that a lender has a duty to
itemize the fees included in its gross estimate of recording fees
at the time of a loan application.
 We therefore remain convinced that a gross estimate of
recording fees in this case "conceals" the identity of a fee that
has no relationship to the person charged therefor, thus deceiving
the borrower into believing that the good faith estimate contains
an exact description of all fees the borrower will be required to
pay at closing. We believe that we have made it clear that the
requirement of a good faith estimate refers to charges that the
borrower has a right to believe are his and that he is not being
required to assume a cost that is not his to bear. Nor can it be
successfully contended that plaintiffs agreed to bear it or that it
was within the contemplation of the parties that they pay it.
 We do not purchase the argument that there is absent in this
case any deceptive practice under the Consumer Fraud Act under the
circumstances stated in the certified question because there was no
misrepresentation or concealment. Plaintiffs argue, correctly, we
believe, not only that defendants were guilty of deception, but
also that assessing them a fee that was not theirs to pay was
unfair under the Consumer Fraud Act. Even if a practice is not
deceptive under the Consumer Fraud Act, it may nevertheless be
unfair. People ex rel. Hartigan v. Knecht Services, Inc., 216 Ill.
App. 3d 843, 853, 575 N.E.2d 1378 (1991). Whether a practice is
unfair depends on a case-by-case analysis. People ex rel. Fahner
v. Testa, 112 Ill. App. 3d 834, 837, 445 N.E.2d 1249 (1983). 
Section 2 of the Consumer Fraud Act directs courts to consider
interpretations of section 5(a) of the Federal Trade Commission Act
in construing Illinois law. 815 ILCS 505/2 (West 1992). In inter-
preting the federal act, the United States Supreme Court has
indicated that courts should consider the following factors in
evaluating whether a practice is unfair:
 "'(1) whether *** it is within at least the penumbra
 of some common-law, statutory, or other established
 concept of unfairness; (2) whether it is immoral,
 unethical, oppressive, or unscrupulous; (3) whether it
 causes substantial injury to consumers (or competitors or
 other businessmen).'" Federal Trade Commission v. Sperry
 and Hutchinson Co., 405 U.S. 233, 244-45 n.5, 31 L. Ed.
 2d 170, 179 n.5, 92 S. Ct. 898, 905 n.5 (1972), quoting
 29 Fed. Reg. 8355 (1964).
 We hold that the circumstances we encounter in this case
establish the commission of an unfair practice under the Consumer
Fraud Act. Plaintiffs maintain that it is unfair for a lender to
burden a borrower with a mortgage assignment recording fee because
the assignment is a transaction that is no part of the loan
transaction. We agree. When a lender assigns a borrower's loan,
the recording fee it incurs in assigning the mortgage is borne by
the lender, as Mr. Giblin testified. Indeed, Mr. Giblin refers to
it almost invariably throughout his deposition as an "assignment
fee."
 The court's holding in Butitta v. First Mortgage Corp., 218
Ill. App. 3d 12, 578 N.E.2d 116 (1991), does not command a
different result. In Butitta, the court held that the plaintiffs'
complaint against a lender for a Consumer Fraud Act violation
failed to state a cause of action. The plaintiffs had sold their
home to a buyer who had obtained a mortgage insured by the Federal
Housing Authority (FHA). Because the FHA prohibited the lender
from charging the borrower a mortgage assignment recording fee, the
lender charged the sellers this fee, but it did not inform the
sellers of the fee until closing. Butitta, 218 Ill. App. 3d at 14.
 The Butitta court held that these allegations were insuffi-
cient to show a violation of the Consumer Fraud Act because the
lender made no misrepresentation, and the plaintiffs failed to show
that the fee was material or illegal. Butitta, 218 Ill. App. 3d at
19-20. The court faulted the plaintiffs for their failure to
"allege that had they known about the charges, they would have
pursued buyers who did not require FHA or VA loans. The allegation
of how one would have acted differently may be raised to support an
inference of materiality. [Citation.] However, the absence of
such an allegation may suggest a lack of materiality." Butitta,
218 Ill. App. 3d at 19. In the case at bar, plaintiffs allege that
they protested the charge at closing, while in Butitta, "there are
not even any allegations that the [plaintiffs] questioned these
charges at the time of closing." Butitta, 218 Ill. App. 3d at 18. 
Moreover, in the case sub judice, plaintiffs, unlike those in
Butitta, alleged that had they known before they had paid any money
to the lender that it would charge them disputed fees in this case,
they "would have pursued refinancing with other lenders who did not
require payment of these fees." Indeed, all of the allegations the
Butitta court found lacking are stated more than adequately in the
case at bar. We therefore hold that plaintiffs state a cause of
action under the Consumer Fraud Act.
 It is also important to note, as we have discussed above, that
section 2 of the Consumer Fraud Act outlaws "unfair or deceptive
acts or practices . . . whether any person has been misled,
deceived or damaged thereby." 815 ILCS 505/2 (West 1992). People
ex rel. Hartigan v. Knecht Services, Inc., 216 Ill. App. 3d 843. 
And whether a practice is unfair depends on a case-by-case
analysis. People ex rel. Fahner v. Testa, 112 Ill. App. 3d 834. 
It also bears repeating that section 2 of the Consumer Fraud Act
directs courts to consider interpretations of section 5(a) of the
Federal Trade Commission Act in construing Illinois law. 815 ILCS
505/2 (West 1992). In interpreting the federal act, the U.S.
Supreme Court has indicated that courts should consider the
following factors in evaluating whether a practice is unfair: 
 "'(1) whether *** it is within at least the
 penumbra of some common-law, statutory, or
 other established concept of unfairness; (2)
 whether it is immoral, unethical, oppressive,
 or unscrupulous; (3) whether it causes sub-
 stantial injury to consumers (or competitors
 or other businessmen).'" Federal Trade Com-
 mission v. Sperry and Hutchinson Co., 405 U.S.
 233, 244-45 n.5, 31 L. Ed. 2d 170, 179 n.5, 92
 S. Ct. 898, 905 n.5 (1972), quoting 29 Fed.
 Reg. 8355 (1964).
 This discussion of what we consider to be the exceedingly
important factor of unfairness is notably absent in Butitta,
presumably because it was not raised by the plaintiffs there. We
nevertheless reiterate our holding that the circumstances we
encounter in this case establish defendants' commission of an
unfair practice under the Consumer Fraud Act, for we have not the
organs to perceive the propriety of passing on to an unknowing
borrower a fee for a transaction of which he is entirely oblivious
until he becomes, conveniently, a captive at closing and his loan
is held hostage to the disingenuousness of the lender. To uphold
such a practice as a "right" of the lender would permit the bank in
this case to charge the borrower for a multiplicity of items, e.g.,
the subsequent recording of the assignments Midwest makes of the
mortgages it peddles to Fannie Mae and Freddie Mac; all we need to
do is to adopt the same justification and logic employed by defen-
dants herein. The fact that the lender felt it necessary to
disclose the charge, but only at a time that put the borrower at
risk, if he protested payment, of breaching his contract with the
seller of the property and forfeiting his not inconsiderable "lock-
in" fee, leads one inevitably to conclude, without any tedious
cerebration, that disclosure at a more reasonable time during the
several weeks' life of the transaction would not have worked to the
advantage of the defendants in this case. We note that the trial
court denied defendants' motion as to the recording fee for the
reason that they had not given plaintiffs' advance notice of the
charge, while granting the motion as to the issue of the escrow
because that fee did not suffer from the same infirmity.
 After reviewing the defendants' arguments regarding the
application of section 1735f-7a(1) of the Depository Institutions
Deregulation and Monetary Control Act of 1980 or the application of
the Illinois Interest Act to the issue of the recording fee, we
determine them to be without merit. Accordingly, we answer the
certified question in the affirmative. 
 We now turn to plaintiff's cross-appeal of the court's
dismissal of their escrow suspension fee claim. The circuit court
did not identify under which Code section it decided the motion to
dismiss this claim, and First National failed to specify under
which section of the Code of Civil Procedure it brought this
motion, as section 2-619.1 requires. Although "hybrid" motions to
dismiss are improper, a reviewing court will review a dismissal
under such a motion if to do so would serve the interests of
judicial economy and if the nonmoving party was not prejudiced. 
See Talbert v. Home Savings Bank of America, F.A., 265 Ill. App. 3d
376, 379, 638 N.E.2d 354 (1994). 
 Plaintiffs were not prejudiced by the court's consideration of
this motion despite its improper form. The record indicates that,
notwithstanding the attachments to its motion, First National
intended to bring the motion under section 2-615, and plaintiffs
responded to it as if it were brought under that section. First
National stated in the motion that it was based on plaintiffs'
failure to "state a claim on which relief could be granted," and it
stated in its second motion to dismiss that the circuit court had
decided the first motion pursuant to section 2-615. Likewise,
plaintiffs took the position in the circuit court and do the same
on appeal that First National's motion is governed by section 2-
615. We therefore review the motion as if it were properly filed
under section 2-615.
 A reviewing court applies a de novo standard of review to
motions to dismiss under section 2-615. Metrick v. Chatz, 266 Ill.
App. 3d 649, 652, 639 N.E.2d 198 (1994). In reviewing a dismissal
for failure to state a claim on which relief may be granted, the
only issue before the appellate court is whether the dismissed
counts state a cause of action. Majumdar v. Lurie, 274 Ill. App.
3d 267, 268, 653 N.E.2d 915 (1995). The court must accept all
well-pleaded facts as true and view them in the light most
favorable to the plaintiff. Smith v. City of Chicago, 253 Ill.
App. 3d 54, 56, 625 N.E.2d 300 (1993).
 Plaintiffs argue that it was a violation of the Consumer Fraud
Act for Gary-Wheaton to charge an escrow suspension fee because (1)
the Escrow Act does not permit a lender to charge a fee in lieu of
an escrow account and (2) Gary-Wheaton failed to disclose the fee
until a few days before closing.
 Under the recent decision in Stern v. Norwest Mortgage, Inc.,
No. 1-95-1627 (Sept. 30, 1996), we hold that the escrow suspension
fee did not violate the Consumer Fraud Act. In Stern, the court
held that an "escrow waiver fee" a lender charged did not violate
the Consumer Fraud Act. Under the Escrow Act, the borrowers in
Stern had chosen to pledge an interest-bearing time deposit rather
than establish an escrow account. The lender charged the borrowers
a fee equal to .25% of the loan principal in permitting them to
exercise this option. The borrowers sued the lender on the ground
that the fee violated the Escrow Act and the Consumer Fraud Act. 
Stern, No. 1-95-1627, slip op. at 1-3. 
 The Stern court held that the fee did violate the Escrow Act
but did not violate the Consumer Fraud Act. The court explained
that the parties had had a legitimate disagreement about the
implications of the Escrow Act and, although the lender erroneously
concluded that this statute did not prohibit its fee, this error
did not amount to a violation of the Consumer Fraud Act because the
Consumer Fraud Act prohibits deception, not error. Stern, No. 1-
95-1627, slip op. at 12-13.
 Stern supports a conclusion in this case that Gary-Wheaton did
not violate the Consumer Fraud Act by charging an escrow suspension
fee. As in Stern, the parties in this case have a legitimate
disagreement as to whether the Escrow Act permits an escrow
suspension fee. Assuming Gary-Wheaton was incorrect in its
interpretation of the Escrow Act, as the lender was in Stern, this
would not prove a violation of the Consumer Fraud Act.
 Moreover, we believe that the Escrow Act does not prohibit a
fee such as the one Gary-Wheaton charged in this case. This
statute governs a borrower's options in the event that a lender
requires an escrow account, and allows a borrower to pledge a time
deposit in lieu of establishing the escrow. The statute does not
address the situation in which a lender waives the escrow require-
ment. The Escrow Act does not, therefore, prevent a lender from
charging a fee for waiving its right to require an escrow. The
Stern decision does not, therefore, require us to find that the
escrow suspension fee violated the Escrow Act. While the fee in
Stern related to a matter covered by the Escrow Act, viz., the
option of pledging a time deposit, the fee in this case involved an
option not addressed by the Escrow Act. 
 We also disagree with plaintiffs that the timing of Gary-
Wheaton's disclosure of the escrow suspension fee violated the
Consumer Fraud Act. It was not unfair or deceptive for Gary-
Wheaton not to disclose the escrow suspension fee until after
plaintiffs had paid their lock-in fee because, as the complaint
shows, plaintiffs did not request an escrow waiver until after this
time. The good faith estimate they received demonstrated that the
parties originally contemplated an escrow arrangement. The
allegations of the complaint also indicate that the parties did not
discuss suspension of the escrow requirement until after the loan
had been approved, and plaintiffs had paid the lock-in fee.
 Although plaintiffs claim that they were forced to pay the
escrow suspension fee because they would otherwise have lost their
lock-in fee, this is not true. As First National argues, they
could have avoided forfeiting their lock-in fee and paying the
escrow suspension fee if they had adhered to the parties' original
arrangement, under which Gary-Wheaton required an escrow account. 
There was no unfairness or deception in Gary-Wheaton charging
plaintiffs a fee to deviate from the original arrangement. Given
that they knew of the escrow suspension fee several days before
closing, plaintiffs had time to decide whether to adhere to the
original arrangement, pay the escrow suspension fee, or forfeit
their lock-in fee and seek another lender.
 Plaintiffs also alleged that Gary-Wheaton misrepresented that
the escrow suspension fee was required and necessary. As First
National argues, it was not a misrepresentation for Gary-Wheaton to
assert that the fee was required because Gary-Wheaton would have
refused to close on the loan without an escrow account if plain-
tiffs had not paid this fee.
 The circuit court, therefore, properly dismissed plaintiffs'
claim relating to the escrow suspension fee because the complaint
stated no violation of the Consumer Fraud Act.
 Plaintiffs also assert that this court must reverse the
circuit court's ruling because it improperly relied on defenses of
voluntary payment or waiver, which First National did not plead,
but the record does not support their claim that the court relied
on these defenses. Moreover, this court may uphold the circuit
court's dismissal on any basis in the record. See Home Indemnity
Co. v. General Accident Insurance Co. of America, 213 Ill. App. 3d
319, 321, 572 N.E.2d 962 (1991).
 We answer the certified question in the affirmative and affirm
the circuit court's judgment dismissing plaintiffs' escrow suspen-
sion fee claim.
 Certified question in No. 1-95-3792 answered in the affirma-
tive. Judgment in No. 1-95-4114 affirmed.
 BURKE, J., concurs.
 DiVITO, J., specially concurs in part and dissents in part.

 JUSTICE DiVITO specially concurring in part and dissenting in
part:
 Although I agree with the majority's decision regarding the
escrow suspension fee, I respectfully dissent from its answer to
the certified question. The disclosure of the mortgage assignment
recording fee, in the circumstances described in the certified
question, was in compliance with RESPA. 
 The majority states that RESPA requires advance disclosure of
all settlement costs. I agree that RESPA requires the disclosure
of all settlement costs on the HUD-1 form, but I disagree that
RESPA requires the same detailed disclosure on the good faith
estimate form. To the contrary, the regulations authorize and
encourage a disclosure such as the one that occurred in this case. 
 The sample good faith estimate form and HUD-1 form contained
in the regulations present the strongest evidence that RESPA
authorizes a lender to provide a borrower with a gross estimate of
recording fees at the time of loan application. Although the HUD-1
form has spaces for a lender to identify the amounts of specific
recording fees, such as fees for recording the mortgage and
releases, the good faith estimate form contains only a single space
for a lender to estimate recording fees. Based on this form, which
the Secretary provided to assist lenders in complying with RESPA,
it is reasonable to conclude that, by placing a gross estimate for
recording fees in the single space the form contains, a lender
complies with RESPA. Although the sample good faith estimate form
contains spaces for "other" fees, these spaces cannot have been
intended for recording fees because the word "other" indicates fees
in categories other than those listed on the form, and "recording
fees" is listed.
 Although the majority states that the purpose of RESPA is
served by detailing each settlement cost a borrower will pay at
closing, this is contradicted by the regulation which prohibits
lenders from adding information to the good faith estimate in order
to preserve the clarity and conciseness of this form. The fact
that, unlike the HUD-1 form, the good faith estimate form contains
only one space for informing borrowers of recording fees also shows
that the good faith estimate is not intended to contain detailed
information.
 Moreover, the stated purpose of RESPA is not just to provide
advance disclosure, it is to provide "effective advance disclo-
sure." A gross estimate of recording fees provides effective
advance disclosure because it allows borrowers to compare the
recording fees of one lender to those of another, while maintaining
the clarity and conciseness of the good faith estimate form.
 I also disagree with the majority's assertion that the lender
in this case did not act with good faith. Given the single space
for recording fees on the good faith estimate form the Secretary
provided, it would not be unreasonable for a lender completing this
form to conclude that it should include all recording fees in that
single space. Significantly, the lender in this case did not omit
the mortgage assignment fee from its estimate. The fee was
included in the $80 it estimated for recording fees and, in fact,
the borrower had to pay $77, which was $3 less than the amount
contained in the estimate.
 The majority also asserts that the lender did not act in good
faith because it did not provide more effective advance disclosure
of the mortgage assignment recording fee to plaintiffs even though,
well in advance of closing, it intended to assign plaintiffs'
mortgage to "its affiliate, created for that very purpose." Slip
op. at 11. Although the record supports a conclusion that Gary-
Wheaton intended, in advance of closing, to assign plaintiffs'
mortgage, there is no support for the majority's assertion that it
intended to assign the mortgage to an affiliate that was created
for this purpose. Instead, the record indicates that Midwest and
Gary-Wheaton did not become affiliates until after plaintiffs' loan
transaction, and Midwest's creation was independent of its later
relationship with Gary-Wheaton. 
 Given that RESPA authorizes a gross estimate of recording
fees, it constitutes a defense to liability under the Consumer
Fraud Act pursuant to section 10(b) of that Act. Analogous cases
under the Federal Truth in Lending Act (15 U.S.C. 1601-65 (1982))
support a finding that RESPA compliance is a defense to liability
under the Consumer Fraud Act. For example, in Lanier v. Associates
Finance, Inc., 114 Ill. 2d 1, 499 N.E.2d 440 (1986), our supreme
court held that a lender's disclosure to a borrower did not violate
the Consumer Fraud Act because it was in compliance with the Truth
in Lending Act. The loan agreement provided that, in the event of
prepayment, the borrower could receive a refund of any unearned
finance charge, and the lender would compute the refund according
to the "Rule of 78's." The borrower complained that the lender had
an obligation to explain the Rule of 78's at the time of the loan. 
Lanier, 114 Ill. 2d at 12. 
 The supreme court concluded that the Federal Reserve Board had
balanced the need to avoid confusion with the need to avoid
informational overload and had concluded that reference by name to
the Rule of 78's was sufficient to inform the borrower of the
method for computing the unearned finance charge. Lanier, 114 Ill.
2d at 12. The court held that, because the lender's disclosure
complied with federal regulations, it was exempt from liability
under section 10(b)(1) of the Consumer Fraud Act. Lanier, 114 Ill.
2d at 17-18. The court explained that, to hold otherwise, would
place a lender in the anomalous position of being guilty of common
law misrepresentation by specifically complying with the Truth in
Lending Act. Lanier, 114 Ill. 2d at 10-11. The Lanier court also
based its holding on its perception that disclosure provisions of
Illinois consumer credit statutes showed a consistent policy
against extending disclosure requirements beyond those required by
the Truth in Lending Act. Lanier, 114 Ill. 2d at 17. 
 Given that a gross estimate of recording fees is authorized by
RESPA, under Lanier, a lender does not violate the Consumer Fraud
Act in the circumstances stated in the certified question. See
also Shields v. Lefta, Inc., 888 F. Supp. 894, 898 (N.D. Ill. 1995)
(creditor's compliance with Truth in Lending Act is a defense to
liability under the Consumer Fraud Act); Price v. FCC National
Bank, No. 1-95-4210 (Nov. 22, 1996) (compliance with the Truth in
Lending Act is compliance with the Illinois Credit Card Issuance
Act); Aurora Firefighter's Credit Union v. Harvey, 163 Ill. App. 3d
915, 923, 516 N.E.2d 1028 (1987) (there was no violation of the
Consumer Fraud Act because the credit union's disclosure complied
with the Truth in Lending Act). 
 As I have explained, I believe the lender complied with RESPA
in this case. Even assuming, however, as the majority argues, that
the disclosure was in violation of RESPA, there would be no
violation of the Consumer Fraud Act. At least two courts have
recently held that a party does not violate the Consumer Fraud Act
by performing an act that is based on an erroneous interpretation
of a statute. See Lee v. Nationwide Cassel, No. 80465 (Nov. 21,
1996) (the defendant did not violate the Consumer Fraud Act by
attempting to hold the plaintiffs primarily liable under an
installment contract for a car because, although the Motor Vehicle
Retail Installment Sales Act prohibited such liability, this law
was uncertain, and the defendant's actions were based on an
erroneous interpretation of the law); Stern v. Norwest Mortgage,
Inc., No. 1-95-1627 (Sept. 30, 1996) (a lender did not violate the
Consumer Fraud Act by charging borrowers a fee for pledging a time
deposit because it did so based on an erroneous interpretation of
the Mortgage Escrow Account Act). In this case, therefore, even if
the lender acted on the mistaken belief that RESPA authorized the
disclosure it made, there would be no Consumer Fraud Act violation.
 I note that the majority's opinion is somewhat inconsistent in
its application of the Stern holding. Although the majority cites
Stern for the proposition that a lender does not violate the
Consumer Fraud Act by acting on an erroneous interpretation of the
Mortgage Escrow Account Act, it holds the lender liable under the
Consumer Fraud Act for an erroneous interpretation of RESPA. 
 RESPA compliance aside, I disagree with the other bases for
the majority's finding of a Consumer Fraud Act violation in this
case. The majority argues that it is deceptive and unfair for a
lender to charge a mortgage assignment recording fee under the
circumstances in this case because the lender and not the borrower
is responsible for paying the fee. The majority relies on Giblin's
deposition testimony that a bank that sells a mortgage to Midwest
is responsible for paying the title company the mortgage assignment
recording fee. According to the majority, this testimony demon-
strates that it is not customary for a bank to charge a borrower a
mortgage assignment recording fee and that a borrower is a "strang-
er" to the assignment transaction.
 I disagree with the majority's reasoning on several bases. 
First, my reading of Giblin's testimony causes me to conclude that,
when he testified that the assigning bank bears the cost of the
mortgage assignment fee, he was describing who was responsible for
the fee in the relationship between Midwest and Gary-Wheaton, not
in the relationship between Gary-Wheaton and a borrower. In
addition, he explained that a lender could charge a borrower the
mortgage assignment recording fee at closing, even if it did not
assign the mortgage until after closing. His testimony, therefore,
does not support a conclusion that the assigning bank always pays
the mortgage assignment recording fee. Furthermore, Giblin's
testimony concerning the relationship between Midwest and Gary-
Wheaton is an insufficient basis from which to conclude that it was
not customary for other banks to charge borrowers a mortgage
assignment recording fee.
 Second, a borrower is not a "stranger" to the assignment of
its loan, as the facts of this case illustrate. As a direct result
of the assignment of their mortgage to Midwest, plaintiffs in this
case received an annual interest rate .05% lower than Gary-Wheaton
could have offered them if it had not assigned their loan. In
addition, at the time of their loan application, Gary-Wheaton
informed plaintiffs that their loan would be sold.
 The mortgage assignment recording fee was, therefore, a cost
of plaintiffs' loan. There is no legal reason why a lender may not
pass this cost on to the borrower in the same way that it charges
borrowers other fees, such as document preparation fees, for its
costs of doing business. 
 I also disagree with the majority's conclusion that a lender
"conceals" the mortgage assignment recording fee by providing a
borrower with a gross estimate of recording fees. It no more
conceals this fee than it conceals other recording fees, such as
the mortgage recording fee, that it more specifically discloses at
closing on the HUD-1 form. As I have explained, a gross estimate
that includes an amount for a mortgage assignment recording fee
sufficiently informs a borrower of this fee and allows the borrower
to make an effective comparison of the recording fees charged by
various lenders. The precise identity of each recording fee, such
as those for recording the mortgage, deed, and releases, as well as
the assignment of the mortgage, would be of little additional help
in comparison shopping for a loan. 
 The court's decision in Butitta v. First Mortgage Corp., 218
Ill. App. 3d 12, 578 N.E.2d 116 (1991), supports a conclusion that
a lender may charge a mortgage assignment recording fee in the
circumstances of this case. The majority distinguishes Butitta on
the basis that, unlike plaintiffs in this case, the plaintiffs in
that case did not allege the materiality of the mortgage assignment
fee. This does not make Butitta inapplicable to the situation
before us, however, because the lack of materiality was only one of
the bases for the court's finding that there was no Consumer Fraud
Act violation. The court held that there was no Consumer Fraud Act
violation in that case because plaintiffs had failed to show that
the mortgage assignment recording fee was material or illegal.
 Plaintiffs in this case may have alleged materiality, but they
have failed to show that the fee was illegal. As Butitta holds, it
is not illegal for a lender to charge a mortgage assignment
recording fee at closing.
 The majority argues that Butitta also differs from the
situation before us because there was no unfairness in that case as
there is here. I cannot accept this argument. In Butitta the
sellers, who were required to pay the mortgage assignment fee, had
no notice before closing that this fee would be among their costs
at closing. By contrast, in this case, plaintiffs received an
estimate that included this fee at the time they made their loan
application. Furthermore, I do not see how it is more fair to
charge a seller a recording fee for the assignment of a buyer's
mortgage than it is to charge a buyer a fee for the assignment of
his own mortgage, especially when he benefits from that assignment
by obtaining a lower interest rate.
 For the foregoing reasons, I would affirm the circuit court's
judgment dismissing plaintiffs' escrow suspension fee claim, but
answer the certified question in the negative.